1

Q. Now, you understand that the charges to which you're pleading guilty are felony offenses. If I accept that plea, you'll be adjudged guilty of the offenses and that may deprive you of valuable civil rights such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess any kind of a firearm. Do you understand all that?

A. Yes.

Q. Now, Mr. Chafee outlined the maximum statutory penalties in this case a moment ago. The maximum penalties include 30 years imprisonment with respect to Count II; ten years of imprisonment with respect to Count III as well as the additional penalties regarding fines and the terms of supervised release and special assessments.

Do you understand that those are the maximum penalties that may apply in your case?

A. Yes.

Q. Now, you've heard the term "supervised release" used here today. You understand what supervised release is?

A. Yes.

Q. Can you tell me in your own words what you think it is?

Rule 11, Hearing

** PAGE 8 of CHANGE of PLEA TRANSCRIPT ** Oct 1, 2003

#2

A. Supervised probation once released out of jail.
Q. And what happens?
A. They check up on you, make sure you're doing everything right.
Q. Okay. You understand that because the maximum sentence in this case involves a penalty of more than 25 years there's no probation sentence available under the law. Do you understand that?
A. Yes.
Q. I mentioned the special assessments for each count of $100. Do you understand you'd be required to pay the special assessment for each of the two counts? That's a special assessment of $200.
A. Yes.
Q. You've heard reference to the Sentencing Guidelines. Have you discussed what the Sentencing Guidelines are with your attorney?
A. Yes.
Q. You understand, generally, how the Sentencing Guidelines might apply to your case?
A. They tell me what I'm looking at. We can go over or under.
Q. Okay. You understand then that I will not be able to determine the appropriate Guideline sentence for your case until after a presentence report is

#3

the conspiracy to distribute cocaine.

For purposes of determining the offense level, the Government agrees to recommend a two-level reduction in the offense level for acceptance of responsibility.

The Government is free to recommend any combination of supervised release, fines and restitution which it deems appropriate.

The maximum statutory penalties for each count of the indictment for which the Defendant is pleading are as follows: 30 years imprisonment, a fine of up to $2 million, a term of supervised release from three years and up to life and a mandatory special assessment of $100.

On Count III, the firearms charge, the maximum is ten years imprisonment, a fine of $250,0000, a term of supervised release from three years and up to life, and a mandatory special assessment of $100.

BY THE COURT: (Continuing)

Q. Mr. Olivera, did you listen carefully to what Mr. Chafee outlined as the terms of the plea agreement?

A. Yes.

Q. Do you agree those, in fact, are the terms of the

** PAGE 6 of CHANGE of PLEA TRANSCRIPT ** Oct 1, 2003

not expect to be treated harshly by the system.

So I'm going to impose here a term of imprisonment of 115 months. I'm going to require a term of supervised release of three years. I will not impose a fine, because I don't believe there are any assets to pay a fine. Special assessment of $100 for the one count will be required.

As a special condition on the term of supervised release, I'm going to require that you participate in a program of substance abuse, which may include drug testing, to determine whether you have reverted to the use of alcohol or drugs.

Now, Mr. Olivera, you have the right to appeal your sentence if you believe that -- or appeal your conviction, that is, if you believe for any reason that your plea was unlawful or involuntary or some other fundamental defect in the proceeding was not waived by your plea.

You also have the statutory right to appeal your sentence if you believe the sentence I've imposed here is illegal.

Is there anything else we need to take up?

MR. ROY: Judge, the Defendant wanted me to mention that, asking the Court to consider

*#5*

the conspiracy to distribute cocaine.

For purposes of determining the offense level, the Government agrees to recommend a two-level reduction in the offense level for acceptance of responsibility.

The Government is free to recommend any combination of supervised release, fines and restitution which it deems appropriate.

The maximum statutory penalties for each count of the indictment for which the Defendant is pleading are as follows: 30 years imprisonment, a fine of up to $2 million, a term of supervised release from three years and up to life and a mandatory special assessment of $100.

On Count III, the firearms charge, the maximum is ten years imprisonment, a fine of $250,0000, a term of supervised release from three years and up to life, and a mandatory special assessment of $100.

BY THE COURT: (Continuing)

Q. Mr. Olivera, did you listen carefully to what Mr. Chafee outlined as the terms of the plea agreement?

A. Yes.

Q. Do you agree those, in fact, are the terms of the

*** PAGE 6 of CHANGE of PLEA TRANSCRIPT ** Oct 1, 2003*

6#

TELEPHONE CONVERSATION BETWEEN ALAN BARTELSON AND LOUIS OLIVERA ON 07/10/03

DM= DAN MCPARTLIN
AB= ALAN BARTELSON
LO= LOUIS OLIVERA

DM: TODAY'S DATE IS JULY 10TH AT AH 4:33 PRESENT IN THE ROOM IS DAN MCPARTLIN, JOE STEEELE AND ALAN BARTELSON. BARTELSON MAKING CALL TO LOUIE OLIVERA AT 401-641-4621.

(PHONE RINGS)

RECORDING: YOU HAVE REACHED, PLEASE LEAVE YOUR MESSAGE AT THE TONE (BEEP).

AB:HEY LOUIE THIS IS AL CAN YOU CALL ME RIGHT BACK? AH.. I'LL ONLY BE AT THIS PHONE FOR A FEW MINUTES, AAH 802-598-4334 ALRIGHT THANKS.

RECORDING: PLEASE HOLD WHILE THE NEXTEL SUBSCRIBER YOU HAVE REACHED IS LOCATED.
(RINGING PHONE)

RECORDING: PLEASE HOLD YOUR CALL IS BEING TRANSFERRED TO AN AUTOMATED VOICE MAIL SYSTEM. YOU HAVE REACHED , PLEASE LEAVE YOUR. PLEASE ENTER YOUR AREA (INAUDIBLE) 025984334 TO SEND THIS MESSAGE. YOUR MESSAGE HAS BEEN SENT. THANK YOU FOR CALLING,

INCOMING CALL:

AB:HELLO
LO: INAUDIBLE
AB: HEY WHAT'S UP
LO: WHAT'S UP
AB: HEY I'M COMING DOWN TOMMOROW, I GOT THOSE TWO THIRTY EIGHTS AND THOSE TWO NINES I GOT LAST NIGHT
LO: ALRIGHT
AB: AH HOW MUCH YOU GONNA GIVE ME FOR THOSE
LO: YEAH, AH I DON'T EVEN KNOW CUZ RIGHT DOWN HERE THERE'S REALLY LIKE NO MATERIAL AROUND.
AB: NO MATERIAL AROUND?
LO: JUST A LITTLE.. BUT FUCKING.... IT'S ONE ~~OF THEM DROUGHTS~~
AB: YEAH?
LO:YEAH
AB: FUCK ...I HAVE TWO GRAND TOO

7#

LO: I'LL PROBABLY BE ABLE TO DO SOMETHING FOR (INAUDIBLE) OF THOSE AND THE THE MONEY BUT
AB: TWO OF THEM AND THE MONEY THAT'S ALL YOU CAN TAKE FOR NOW YOU CAN'T DO THREE
LO: YEAH, YEAH CUZ AH TO GET THAT MUCH MATERIAL I'M GONNA HAVE TO FUCKING...
AB:OK I GOT TWO GRAND, WHAT DO YOU WANT THE NINE'S OR THE THIRTY EIGHTS
LO: WHICH EVER ONES ARE SMALLER
AB: OK.. THE THIRTY EIGHT SPECIALS .. AND AH WHAT'LL YOU GIVE ME FOR THEM? YOU KNOW THERE HOT SO..
LO: YEAH
AB: HOW MUCH FOR THOSE?
LO: YEAH IT'S BETTER LIKE THAT.
AB: HOW MUCH YOU WANT TO STILL GIVE ME THE SAME? ..OR..
LO: YEAH
AB: TWO? TWO A PIECE?
LO: ONE AND A HALF I'LL GIVE YOU
AB: OK... THAT'LL WORK...ALRIGHT I'M COMING DOWN ABOUT TWO THIRTY IN THE AFTERNOON
LO: ALRIGHT CALL ME TONIGHT IF YOU'RE GONNA DEFINETLY COME
AB: I'M DEFINITELY COMING, I AINT GOT A PHONE RIGHT NOW LOUIE ..I'M BORROWING MY BROTHERS..
LO: WELL I CAN DEFINITELY COUNT ON YOU FOR TWO G'S RIGHT? *
AB: YEAH YOU CAN COUNT ON THAT AND TWO PIECES
LO:ALRIGHT
AB:ALRIGHT?
LO:ALRIGHT
AB: I'LL CALL YOU TOMMOROW BEFORE I LEAVE
LO: ALRIGHT
AB: ALRIGHT BYE.
DM:AH THE LAST CALL WAS FROM LOUIE OLIVERA FROM 401-641-4621 CALLING ALAN BARTELSON AT APPROXIMATELY FOUR FORTY STILL PRESENT IN THE ROOM DAN MCPARTLIN, JOE STEELE AND BARTELSON

 #8

and plaining before it went down on the 11th o
July?
A. Yes.
Q. I read the transcript of the July 10th conversation. And correct me if I'm wrong, but the planning was for two guns to be brought down by Mr. Bartelson?
A. Yes, sir.
Q. And at some point in time, that changed to four guns?
A. Yes, sir, it did.
Q. Who made the decision to change it from two to four?
A. I'm not sure exactly who it was.
Q. Because I read the transcript and again, please correct me if I'm wrong, as I read that transcript of the July 10th conversation, Mr. Olivera and Mr. Bartelson had agreed to trade $2,000 cash and two guns for some cocaine, correct?
A. That's correct. Yes.
Q. And then Mr. Bartelson showed up with four guns?
A. That's correct. And no cash, yes.
Q. Does anybody know why -- do you know why that happened?
A. We didn't have any cash for him. There was no

PAGE 19, of the Sentencing Hearing Feb 19, 2004. **

#9

TELEPHONE CONVERSATION BETWEEN ALAN BARTELSON AND LOUIS OLIVERA ON 07/10/03

DM= DAN MCPARTLIN
AB= ALAN BARTELSON
LO= LOUIS OLIVERA

DM: TODAY'S DATE IS JULY 10TH AT AH 4:33 PRESENT IN THE ROOM IS DAN MCPARTLIN, JOE STEEELE AND ALAN BARTELSON. BARTELSON MAKING CALL TO LOUIE OLIVERA AT 401-641-4621.

(PHONE RINGS)

RECORDING: YOU HAVE REACHED, PLEASE LEAVE YOUR MESSAGE AT THE TONE (BEEP).

AB:HEY LOUIE THIS IS AL CAN YOU CALL ME RIGHT BACK? AH.. I'LL ONLY BE AT THIS PHONE FOR A FEW MINUTES, AAH 802-598-4334 ALRIGHT THANKS.

RECORDING: PLEASE HOLD WHILE THE NEXTEL SUBSCRIBER YOU HAVE REACHED IS LOCATED.
(RINGING PHONE)

RECORDING: PLEASE HOLD YOUR CALL IS BEING TRANSFERRED TO AN AUTOMATED VOICE MAIL SYSTEM. YOU HAVE REACHED , PLEASE LEAVE YOUR. PLEASE ENTER YOUR AREA (INAUDIBLE) 025984334 TO SEND THIS MESSAGE, YOUR MESSAGE HAS BEEN SENT. THANK YOU FOR CALLING,

INCOMING CALL:

AB:HELLO
LO: INAUDIBLE
AB: HEY WHAT'S UP
LO: WHAT'S UP
AB: HEY I'M COMING DOWN TOMMOROW, I GOT THOSE TWO THIRTY EIGHTS AND THOSE TWO NINES I GOT LAST NIGHT
LO: ALRIGHT
AB: AH HOW MUCH YOU GONNA GIVE ME FOR THOSE
LO: YEAH, AH I DON'T EVEN KNOW CUZ RIGHT DOWN HERE THERE'S REALLY LIKE NO MATERIAL AROUND.
AB: NO MATERIAL AROUND?
LO: JUST A LITTLE.. BUT FUCKING.... IT'S ONE OF THEM DROUGHTS
AB: YEAH?
LO:YEAH
AB: FUCK ...I HAVE TWO GRAND TOO

July 10th, 2003 transcript

#10

LO: I'LL PROBABLY BE ABLE TO DO SOMETHING FOR (INAUDIBLE) OF THOSE AND THE THE MONEY BUT
AB: TWO OF THEM AND THE MONEY THAT'S ALL YOU CAN TAKE FOR NOW YOU CAN'T DO THREE
LO: YEAH, YEAH CUZ AH TO GET THAT MUCH MATERIAL I'M GONNA HAVE TO FUCKING...
AB: OK I GOT TWO GRAND, WHAT DO YOU WANT THE NINE'S OR THE THIRTY EIGHTS
LO: WHICH EVER ONES ARE SMALLER
AB: OK.. THE THIRTY EIGHT SPECIALS .. AND AH WHAT'LL YOU GIVE ME FOR THEM? YOU KNOW THERE HOT SO..
LO: YEAH
AB: HOW MUCH FOR THOSE?
LO: YEAH IT'S BETTER LIKE THAT.
AB: HOW MUCH YOU WANT TO STILL GIVE ME THE SAME? ..OR..
LO: YEAH
AB: TWO? TWO A PIECE?
LO: ONE AND A HALF I'LL GIVE YOU
AB: OK... THAT'LL WORK...ALRIGHT I'M COMING DOWN ABOUT TWO THIRTY IN THE AFTERNOON
LO: ALRIGHT CALL ME TONIGHT IF YOU'RE GONNA DEFINETLY COME
AB: I'M DEFINITELY COMING, I AINT GOT A PHONE RIGHT NOW LOUIE ..I'M BORROWING MY BROTHERS..
LO: WELL I CAN DEFINITELY COUNT ON YOU FOR TWO G'S RIGHT? *
AB: YEAH YOU CAN COUNT ON THAT AND TWO PIECES
LO:ALRIGHT
AB:ALRIGHT?
LO:ALRIGHT
AB: I'LL CALL YOU TOMMOROW BEFORE I LEAVE
LO: ALRIGHT
AB: ALRIGHT BYE.
DM:AH THE LAST CALL WAS FROM LOUIE OLIVERA FROM 401-641-4621 CALLING ALAN BARTELSON AT APPROXIMATELY FOUR FORTY STILL PRESENT IN THE ROOM DAN MCPARTLIN, JOE STEELE AND BARTELSON

#11

762070-03-0096

## UNDERCOVER MEETING BETWEEN ALLAN BARTELSON, ROBERTCAMERA, AND SPECIAL AGENT SANDRA LACOURSE ON 07-11-2003

BC: WHERE'S YOUR CAR? OVER THERE. WHERE'S YOUR CAR AT.

UC: OVER HERE. I GOT IT TURNED EXACTLY AROUND AND SHE PUT THAT ON ME. WELL YEAH, I DON'T WANT A TOW TRUCK COMING. WHAT'S UP? ALL RIGHT. I MEAN IT'S MAKING ME NERVOUS. I HAD A COUPLE OF DIFFERENT DELIVERY PEOPLE TRY TO TELL ME TO GET OUT OF THEIR WAY. I'M LIKE I CAN'T MOVE IT.

UC: YOU WANT TO SEE THE STUFF? I'LL GIVE YOU A QUICK.

BC: NAH, NAH. JUST THROW IT IN THE BAG. THAT'S IT. IN THE BACK PACK. AND I GOT THIS RIGHT HERE. I GOT THIS RIGHT HERE. YOU GONNA MAKE THAT PLAY RIGHT?

UC: ACTUALLY, UM, I DON'T WANT TO GIVE IT. THE KID THE. NO OFFENSE, I DON'T WANT TO GIVE IT TO THE KID THE STUFF.

BC: WHO ME?

UC: YEAH, NO WAY. NO WAY.

BC: INAUDIBLE.

UC: I'LL SHOW IT TO YOU.

BC: INAUDIBLE

UC: I'LL TELL YOU WHAT I GOT, BUT I TOLD HIM, MY BOYFRIEND GOT IT. AND I JUST DON'T WANT.

BC: INAUDIBLE.

UC: ??? SO ARE WE.

BC: OK, SO LET'S DO THIS THING.

UC: IT JUST DOESN'T\'T FEEL RIGHT. IT JUST. I'LL SHOW YOU WHAT WE GOT.

#12

BC: I KNOW WHAT YOU GOT. I DON'T UNDERSTATND IT. I JUST WANT TO PUT THEM IN THE BAG AND GO.

UC: HUH

BC: INAUDIBLE. LOUID ALL READY TOLD ME WHAT ITS ABOUT.

UC: THESE TWO ARE THE ONES MY BOYFRIEND GOT. THE REVOLVERS HE DID. ALL RIGHT. NO OFFENSE BUT I JUST.

BC: YOU DON'T WANT TO DO IT THEN.

UC: I DO WANT TO DO IT. BUT I DON'T, I DON'T KNOW. OBVIOUSLY AND I DON'T KNOW THE OTHER GUY BUT I'S RATHER DEAL WITH THE GUY HE KNOW.

BC: YEAH. BUT LOUIE SENT ME MAN. I'M GOOD ENOUGH MAN. IF YOU'RE GONNA TRUST LOUIS, YOU 'RE GONNA TRUST ME. YOU KNOW WHAT I'M SAYING. I'M NOT NO FUCKING COP PR NOTHING MAN. I AIN'T OUT TO GET YOU OR NOTHING LIKE THAT. I JUST WANT TO DO THIS REAL QUICK.

UC: I'M NOT EITHER. IT'S JUST MAKING ME NERVOUS HAVING THIS STUFF HERE. WHEN I GOT ALL THESE DELIVERY TRUCKS TRYING TO GET ME OUT OF THE WAY.

BC: ALL RIGHT THEN. JUST THROW THSE THING IN HERE MAN. WE'LL MAKE THIS DEAL WILL BE OUT REAL QUICK EASY.

UC: I DON'T KNOW IF THERE GONNA END UP GETTING BACK TO HIM.

BC: IT IS. I GOT HIS HE JUST GAVE ME HIS(THIS) STUFFTO GO DROP OFF TO YOU AND I'M GOING TO GO BACK TO HIM RIGHT NOW. SO EITHER WAY HE'S GETTING HIS SHIT BACK. I LIVE WITH HIM YOU KNOW WHAT I'M SAYING. HE JUST SENT ME BECAUSE HE DON'T WANT TO MAKE THE PLAY THAT'S WHY. I WANT TO MAKE THIS PLAY AND GET OUT OF HERE, MAN. YOU WANT TO DO THIS OR WHAT. LET'S DO THIS REAL QUICK.

UC: I WANT TO DO IT BUT I

AB: INAUDIBLE

BC: YOU AIN'T GONNA DO IT. ALL RIGHT MAN.

AB: SHE WANTS YOUR DAD TO COME.

#13

BC: HUH

AB: SHE WANTS LOUIE TO COME

UC: YEAH I DO, I DID WANT TO SHOW HIM.

BC: HE ALL READY KNOWS WHAT

UC: HE WANTS OTHER STUFF. I DON'T KNOW IF THAT'S WHAT HE LIKES

AB: AND BECAUSE SHE'S GOT A LOT. SHE'S GOT A BETTER DEAL COMING AROUND THAT'S WHY.

BC: YEAH, SO THEN THEN GIVE THAT TO HIM AND WE'LL JUST FLY OUT OF HERE. THAT'S WHAT HE WANTS. I JUST WANT TO GET OUT O F HERE. YOU WANT TO DO IT OR NOT. CAUSE I'M JUST GONNA GO BACK TO THE HOUSE AND TELL HIM YOU DIDN'T WANT TO DO IT. YOU DON'T WAN TO DO IT THEN?

UC: I DO WANT TO DO IT. I JUST DON'T WANT TO DO IT WITH YOU. I DON'T KNOW YOU.

BC: I KNOW BUT HE SENT ME MAN. I'M JUST RUNNING FOR THIS RIGHT KNOW. KNOW WHAT I'M SAYING.

UC: RIGHT, RIGHT. THE SAME REASON WHIY MY BOYFRIEND SENT ME. CAUSE I'M DONG HIS DIRTY WORK. I'M HERE I DON'T WANT KNOW WHY YOU GOT SENT. ?? GET IN TROUBLE.

BC: SO I'M JUST A RUNNER. I'M JUST GONNA PUT THIS HERE THEN. I GOT THIS STUFF IN MY POCKET. I DON'T HOLD IT EITHER.

UC: GIVE HIM A CALL; GIVE HIM A CALL TELL HIM I WANT TO DO IT.

AB: YOU GOT YOUR PHONE ON YOU? YOU CALL HIM.

BC: NO I'M NOT CALLING HIM. I GOT A PHONE IN THE HOUSE.

UC: YOUR PHONE'S IN THE CENTER COUNSOLE.

BC: PUT THAT SHIT IN A BAG OR SOMETHING.

UC: YEAH I KNOW.

BC: I WAS GETTING NERVOUS.

#14

UC: THAT'S WHY I GOT IT COVERED UP WITH A COAT. I WAS GETTING NERVOUS CAUSE IT'S TAKING SO DAMN LONG.

BC: I KNOW I COULDN'T FIND YOU. I WAS UP OVER THERE. I WAS FUCKING LOOKING AROUND FOR YOU I WAS MAN I WAS LIKE I DON'T KNOW WHERE YOU WAS AT.

UC: I'VE HAD A HELL OF A NORNING. THES IS MY MOTHER'S CAR. I DON'T KNOW WHAT THE FUCK HAPPENED TO IT. WE STOPPED WE GOT GAS, WE CAME, IT STARTET SPUTTERING, STAMMERING. I TRIED TO TURN AROUND AND THES IS WHERE IT DIED.

AB: YOU WAN TO TAKK TO HIM.

BC: NO YOU. TALK TO HIM; TELL HIM WHAT'S GOING ON. THEN WE'RE GONNA GO CAUSE I WANT TO GET OUT OF HERE, BRO. ?? I WANT TO GET OUT OF HERE BEFORE ???

(PG20)

U/C: SO FAR WE HAVEN'T BEEN HARRASSED YET EXCEPT BY DELIVERY TRUCK

B/C: I KNOW I GOT A BIG THING IN MY POCKET

A/B: (TALKING TO OLIVERA ON PHONE) IT'S THE CHICK I'M WITH, SHE DON'T WANT TO GIVE THE GUNS TO YOUR KID. I DON'T KNOW SHE WON'T

B/C: IF YOU WANT MAN, YOU TALK TO HIM. CUZ I DON'T WANT TO BE STANDING AROUND HERE LIKE THIS

U/C: I DON'T EITHER. WE BEEN HERE WAY TOO LONG AS IT IS...

A/B: I DON'T KNOW WHAT'S UP.

B/C: INAUDIBLE

U/C: HUH

B/C: TELL HIM WHAT'S GOING ON MAN.

A/B: YEAH I AM TALKING TO HIM.

B/C: WHAT' S HE GONNA DO?

#15

A/B: YEAH. YOU TALK TO HIM (BARTELSON HANDS PHONE TO CAMERA)

B/C: HELLO. WHAT YOU WANT TO DO MAN. YOU WANT TO GIVE THIS THING. I DON'T THINK THIS THINGS GONNA GIVE IT TO ME NOW. CUZ THEY DON'T KNOW ME. I KNOW THAT'S WHAT I'M SAYING CUZ. I GOT THIS THING... LET'S MAKE THIS PLAY AND I'LL FUCKING BE OUT. HOLD ON. HERE (CAMERA GIVES PHONE TO BARTELSON)

A/B; HELLO...

U/C: THE THING IS MY BOYFRIEND HE GOT THOSE TWO NINES. I DON'T KNOW IF THAT' S WHAT HE LIKES OR HE NORMALLY LIKES.

B/C: THAT'S WHAT HE WANTS NOW, IF HE KNOWS WHAT YOU TOLD HIM THEN THAT'S WHAT HE WANTED THEN THAT'S WHAT HE WANTS YOU KNOW WHAT I'M SAYING. I JUST WANT TO MAKE THIS PLAY MAN, YOU KNOW

U/C: YEAH. I HEAR YOU. HE CAN GET 40'S, 45'S I DON'T KNOW IF THAT'S WHAT HE LIKES OF IF HE LIKES THE NINES.

B/C: LET'S JUST MAKE THIS PLAY. I'LL GIVE YOU THIS THING AND ROLL OUT

A/B: HE AIN'T COMING OUT

U/C: HE AIN'T COMING OUT? LET ME TALK TO MY BOYFRIEND I'M GONNA GIVE HIM A CALL.

B/C: MAN THAT'S A LOTTA.

U/C: IF IT MAKES YOU NERVOUS TO STAND HERE THEN FINE. TAKE A RIDE COME BACK IN 5 MINUTES; I'M GONNA CALL MY BOYFRIEND. I'LL SEE ABOUT WHAT HE WANTS ME TO DO. ALRIGHT. CUZ THESE ARE HIS GUNS. HE TOLD ME TO GIVE THEM TO A FRIEND OF THIS GUY'S. I WAS JUST DOING A FAVOR DRIVING HIM DOWN HERE. BUT I JUST DON'T WANT ANYTHING TO COME BACK WHERE THE GUY DOESN'T GET THEM.

B/C: ALRIGHT THEN

U/C: YOU'RE HIS SON?

B/C: YEAH, BUT YOU KNOW. ALRIGHT THEN GO AHEAD MAKE YOUR PLAY. AND I'LL COME BACK.

#16

U/C: ALRIGHT

U/C: WHAT ARE WE DOING?

A/B: HE JUST NOTICED YOUR BUDDIES

U/C: HEY! WHAT'S HIS NAME?

A/B: UH. I DON'T KNOW. HE WAS ASKING WHO THOSE GUYS WERE OVER THERE... WHAT AM I BEING SET UP

U/C: NO... YUP... YES HE DOES... HE DOES WANT TO DO IT

A/B: DO IT ... FOLLOW THE KID TO THE HOUSE

U/C: I DON'T KNOW HIS NAME. DO YOU KNOW HIS NAME?

A/B: THAT KID?

U/C: YEAH

A/B: NO IT'S LUIS SON

U/C: ALRIGHT

A/B: IT CAN'T BE HIS SON, LUIS AINT THAT OLD. YOU CAN DO IT FOLLOW HIM TO THE HOUSE

U/C: HE'S SUPPOSED TO COME BACK

A/B: HE'S RIGHT THERE.

U/C: IS HE... HE TOLD ME TO GIVE THEM TO YOU. I JUST HOPE THEY GET BACK TO THE GUY

B/C: WHO'S THE THREE DUDES SITTING IN THAT CAR OVER THERE?

U/C: I DON'T KNOW. I DON'T KNOW WHO ANYBODY IS HERE. I'M NOT FROM AROUND HERE.

B/C; HE'S A FUCKING..

A/B; I HAVE NO IDEA WHO THAT IS.

B/C: CHECK IT. LET'S GO TO ANOTHER... ALRIGHT.

#17

U/C: I'LL PUT THEM IN FOR YOU.

A/B: THE CAR'S DEAD. THE CAR IS DEAD.

B/C: YOU WANT THIS SHIT TOO?

U/C: I CAN'T MOVE I'M STUCK, I'LL STICK EM IN THERE

B/C: STAND RIGHT THERE. STAND IN FRONT OF ME

U/C: YEAH, DON'T WORRY THERE'S NOBODY IN THAT TRUCK RIGHT

B/C: NOT NO MORE

U/C: ALRIGHT OK

B/C: ALRIGHT

U/C: MY BOYFRIEND DEWEY'S GONNA BE PISSED.... DEWEY'S GONNA HATE IT...DEWEY, DEWEY, DEWEY.

ARREST TEAM; GET DOWN, GET DOWN, GET DOWN, STAY DOWN, STAY DOWN

U/C: ALRIGHT ALL RIGHT

A/B: WHERE DO I GO?

U/C: JUST STAY RIGHT HERE. YOUR'E NOT GOING ANYWHERE.

U/C: YOU GOT IT ON YOU.

A/B: YEAH... YOU WANT ME TO GIVE IT TO HERE ... I'M NERVEOUS

U/C: IF IT WILL MAKE FEEL BETTER GET IN THE CAR... THAT'S HIS SON? HE'S AN AWFULLY BIG KID

A/B: I DON'T THINK THAT 'S HIS SON. HE SAID HE IS 25... THERE'S NO WAY

U/C: ALRIGHT THERE'S SUPPOSEDLY FOUR OUNCES THERE RIGHT?

A/B: YEAH

ARREST TEAM; YOU GOT ROOM FOR THE BIKE?

#18

U/C: UH. IT'S PRETTY MUCH EMPTY, I'VE GOT SOME OF MY OWN STUFF… YOU DID ALL RIGHT DON'T WORRY ABOUT IT.

A/B: INAUDIBLE

U/C: ALRIGHT, I'LL JUST. TODAYS DATE IS JULY 11TH, 2003 THE APPROXIMATE TIME IS404, ~~THE PRE~~CEEDING IS A UNDERCOVER OPERATION IN PROVIDENCE RHODE ISLAND, REGARDING THE SWAP OF 4 OUNCES OF COKE FOPR 4 FIREARMS… SUBJECT STILL TO BE IDENTIFIED

U/C: UH I'M HOT NOW LET'S SEE WHAT THEY WANT TO DO

U/C: YOU HAVE THEM ON YOU

A/B: CIGARETTES?

U/C: YEAH

A/B: I LEFT THEM

U/C: HOW WE DOING? FORTUNATELY… I TRIED TO GET HIM TO COME OUT… NOBODY HERE SMOKES AL.

19#

the 9's or the 38's?" And Olivera says, "Whichever ones are smaller." And Bartelson says, "Okay. The 38 specials." And Bartelson says, "Two? Two apiece?" And Olivera says, "One and a half." Means I'll give you one and a half ounces for each one. Then Bartelson says, "That will work. All right. I'm coming down about 2:30 in the afternoon." "All right. Call me tonight if you're definitely coming."

And Bartelson says, "Oh, I'm definitely coming. I ain't got a phone right now, Louie. I'm borrowing my brother's buddy's. I'm borrowing my buddy's." "Well, can I definitely count on you for two G's, right?" That's Olivera. "Yeah, you can count on that and two pieces." Pieces meaning $2,000 and the firearms.

So they agreed to meet. And they had been meeting many times so that this was a routine for them. So Bartelson was then taken down to the Providence Police Department by some agents from Vermont. The agents also brought four guns from Vermont, from -- there's a supply of guns that the Alcohol, Tobacco and Firearms agency uses for stings. They're working firearms. They are made to fire a bullet. And they come down, they're

and plaining before it went down on the 11th of July?

A. Yes.

Q. I read the transcript of the July 10th conversation. And correct me if I'm wrong, but the planning was for two guns to be brought down by Mr. Bartelson?

A. Yes, sir.

Q. And at some point in time, that changed to four guns?

A. Yes, sir, it did.

Q. Who made the decision to change it from two to four?

A. I'm not sure exactly who it was.

Q. Because I read the transcript and again, please correct me if I'm wrong, as I read that transcript of the July 10th conversation, Mr. Olivera and Mr. Bartelson had agreed to trade $2,000 cash and two guns for some cocaine, correct?

A. That's correct. Yes.

Q. And then Mr. Bartelson showed up with four guns?

A. That's correct. And no cash, yes.

Q. Does anybody know why -- do you know why that happened?

A. We didn't have any cash for him. There was no

21

cash to be traded.

Q. And -- all right. That's fine. Now, the interview that you had of Mr. Olivera when he talked about the incident, was any of that reduced to writing?

A. Special Agent Yankee, he created a report which synopsized --

Q. Was Mr. Olivera's statement itself reduced to writing?

A. No. He would not provide a written statement.

MR. ROY: That's all I have. Thank you.

MR. CHAFEE: I have no further questions.

THE COURT: Okay. You may step down Agent West. Thank you very much.

Do you have any further witnesses?

MR. CHAFEE: That's the Government's case, your Honor.

THE COURT: All right. Very good.

Mr. Roy, do you want to present any evidence?

MR. ROY: Your Honor, again, if I could have one moment to speak to the Defendant.

THE COURT: Certainly.

MR. ROY: Thank you, Judge.

Your Honor, the Defendant informs me that he wishes to provide two items the Court already

22#

So Camera transfers the cocaine to Bartelson. Bartelson gives it to the agent. Camera rides off headed back to Luis with the four guns, doesn't get very far in the parking lot, and he's arrested with the four guns I've described in his backpack.

And then the evidence would be that the Defendant made admissions. And one of the admissions was that he had indeed arranged this guns-for-drugs deal. So he acknowledged that.

* The evidence further would be that the Defendant had been, before July 11th, 2003, that he had been convicted of a felony, that is, a crime punishable by a term of imprisonment exceeding one year. We have a stipulation to that effect.

The drugs were tested at the lab, and they were found to be cocaine and weighing about 77 grams.

Not the Guns

Now, after Camera was arrested in the parking lot, the agents moved and arrested Luis at his house at 87 Hawkins Street, and then he was brought down to law enforcement officers and made that admission that he had set up the deal.

It also would be proven that Camera had a

** Oct 1, 2003 Plea Hearing **

FEDERAL DEFENDER OFFICE
DISTRICT OF RHODE ISLAND
10 WEYBOSSET STREET, 3RD FLOOR
PROVIDENCE, RHODE ISLAND 02903

23#

September 3, 2003

Luis Olivera
Inmate
Intake Service Center
Adult Correctional Institution
Cranston, RI 02920

Dear Luis:

After we met yesterday, I took another look at your case file. I decided to do this because you stated that you felt that you wanted to go to trial in your case. After reviewing the discovery in your case and the indictment, my opinion is that it would be very difficult to win a trial.

In the indictment you you are charged with three counts. Count One charges you with a charge of conspiracy to distribute cocaine. Count Two charges you with distributing cocaine. Finally, Count Three charges you with being a felon in possession of four handguns.

A conspiracy is an agreement between two or more people to violate the law. In your case, the evidence is not favorable to you. The police found your fingerprint on the bag which contained the cocaine. Prior to Robert Camera delivering the cocaine, you had some conversation with Alan Bartelson, the ATF's informant. Some of these calls were taped and we are awaiting copies. In addition, Bartelson is available to testify that he had prior dealings with you in which he traded handguns for cocaine. The surveillance tapes show that you and Camera met prior to Camera going to meet the ATF informant. Finally, you gave a statement to the police after being arrested. According to the file, you were given your Miranda warnings prior to giving the statement. Although the statement is not in writing, a judge will most likely allow the jury to hear the statement by the ATF Agent testifying as to what you said. Your own statement is sufficient to convict you of conspiracy with Camera. You stated that you made a phone call to obtain the cocaine for Camera. Again, your fingerprint is on the bag in which the cocaine was found.

In the delivery charge, Count Two, the government claims that you aided and abetted, or assisted, in the delivery. If a jury believed that you made the call and acted as the middleman for the deal with Camera and Al, that would be more than enough to convict you of the charge.

24 #

Luis Olivera
September 3, 2003
Page two, continued

The final charge is the charge of being a felon in possession. Although you did not in fact hold the guns in your hand, you could still be convicted if a jury found that you had sent Camera for the guns. The concern I have is that there were several monitored phone calls made which are damaging to you. This is known as constructive possession.

I am writing to you because you should be aware of the evidence against you. In addition, in federal court, under the Sentencing Guidelines, you receive three points off your sentencing level if you plead early. All in all, it will be very difficult to win your case at trial.

In terms of the sentencing guidelines, I made a preliminary review. Because the deal was for 80 grams of cocaine, you start off at level 16, which may be increased four levels due to the guns. I estimate that your criminal history is a category IV, giving you a sentencing range at level 20 of 51-63 months, if you accept responsibility, you will be reduced three levels, giving you a range of 37-46 months. The difference between the bottom of 37 and the top of 63 is 26 months or over two years.

I expect that I will receive the video tapes and audio tapes this week and will arrange to meet you at the Intake Center.

Very truly yours,

EDWARD C. ROY, ESQUIRE

ECR/...

Case No. . . . : 1-03-098954 (Continued)
Birth Country : United States of America
Race . . . . . : White Sex . . . . . . : Male
Ethnic Origin : Not of Hispanic Origin
Street Number : 81 HAWKINS ST
City . . . . . : PROVIDENCE, RI
Residency . . : Resident of Providence

#25

************** V I C T I M I N F O R M A T I O N - # 1 *****************

Name . . . . . . : SOCIETY, Race . . . . . . : Unknown
Sex . . . . . . : Unknown Ethnic Origin : Unknown
City . . . . . . : PROVIDENCE, RI
Home Phone No. : 401/000-0000 Business Phone : 401/000-0000
Other Phone Nbr: 401/000-0000 Residency Statu: Resident of Providenc

**************************** N A R R A T I V E # 1 *************************

Original Report Reported By: SION, GREGORY M. 7/11/
Entered By.: SION, GREGORY M. 7/11/

On July 11, 2003 at approximately 1100 hours a joint operation was briefed. The operation which was initiated by ATF agents from the Providence field office, and the Vermont field office conducted an investigation into a subject known as Luis Olivera DOB 06-12-76 of 81 Hawkins Street. Olivera who was involved in numerous drug dealing,and firearm trafficking. The agents with the assistance of an undercover officer, and a cooperating defendant set up a deal with Olivera in which the agents were to receive four (4) ounces of cocaine base (crack). Olivera wanted four (4) assorted firearms in return.
RAC Monty Monteiro who is in charge of the Providence ATF field division advised several agency to assist in the investigation. The agency involved were Providence Police with Sgt. Correia supervising, DEA agents, as well as ATF agents from the Vermont, and Massachusetts field office.

At approximately 1430 hours a call was made to Olivera to meet the cooperating defendant, and the undercover officer at the Super Stop and Shop located on West River Ave. Olivera who was under surveillance at his residence agreed to the meet. After several minutes an officer observed a white male approach 81 Hawkins Street on a mountain bike. The subject who was later identified as Robert Camera DOB 09-10-79 engaged in a conversation with Olivera. After several minutes the officer observed Camera pull out of the area on the mountain bike with a red back pack on. DEA agents followed Camera who peddled to the Super Stop and Shop parking lot. Camera drove around the lot and then eventually met with the Co-operating defendant, and the Undercover Officer. Camera then performed the deal by handing a large black plastic bag which contained two clear plastic bags with suspect cocaine, and received the four (4) prop firearms. Camera began to peddle away from the area and was quickly surrounded by agents. Camera was apprehended and the four (4) prop firearms were seized from his red back pack. (The four prop firearms were #1- .357 magnum, revolver serial # 144576. #2- .38 Smith and Wesson revolver, serial numbers #5J1296. #3- .9MM semi automatic Brownings Arms, serial #245RR37631. #4- .9MM semiautomatic luger,

#26

but they do talk about "If Count 28 had been dismissed with prejudice, we would summarily reject Raineri's argument as a rather mechanical claim that he did not get what he had bargained for." The count -- anyway, it goes on.

THE COURT: Right. I read that. I'm not sure I understand how that -- I guess what you're saying is if you dismiss Count II with prejudice in this case that there can be no claim that somehow anything related to Count II contributed to or undermined the voluntariness of the plea with respect to Count III.

MR. CHAFEE: I guess so. I'm going to move ahead. I think I cleared it up in my own mind. I think what your Honor says, he wants finality, your Honor wants finality before he sentences, I want to get this thing sentenced.

* I'm moving to dismiss Counts I and II with prejudice. I'd like to move now to the sentencing hearing.

There is an issue as to whether there should a four-level increase under guideline 2K2.1(b)(5). (RESEARCH IT).

THE COURT: Okay. Well, Mr. Olivera, you understand what's going on here?

** PAGE 33 of MOTION TO VACATE AND SENTENCING TRANSCRIPT **
* HEARING DATE: 13 FEBRUARY 2004 *

Island, he did knowingly and intentionally distribute a mixture and substance containing a detectable amount of cocaine or in this case he aided and abetted in the distribution of cocaine.

In that charge, the elements are that the Defendant knowingly, that is, he knew what he was doing; intentionally, he intended to do what he was doing; aided and abetted, that is, he helped knowing what was going on, knowing that a crime was to be committed, was going to be committed. He helped commit that crime by his actions, knowing that he was doing that. And that in the course of that crime in this case, cocaine was distributed. That means it was passed from one person to another intentionally, and that it was indeed cocaine. That cocaine, a Schedule II controlled substance.

Count III, the gun case charge, is that on or about July 11th, 2003, here in the District of Rhode Island, the Defendant, having been convicted of a crime punishable by a term of imprisonment for a term exceeding one year, that is, he had a felony conviction, did knowingly possess in and affecting commerce four firearms. In this case, it's set forth in the indictment a Smith & Wesson

**PAGE 14 OF THE CHANGE OF PLEA TRANSCRIPT **
*HEARING DATE: 1st OCTOBER 2003*

28

.38, a Browning .8 millimeter, another Browning .9 millimeter, and a Colt Python .357, and that he in this case, constructively possessed those weapons.

Now, the elements are that he had been convicted of this felony; that he knowingly, that is, he knew what he was doing; possessed, that is, he had within the control of himself or a person working for himself, in this case, a person working for him. In and affecting commerce, that means the guns traveled across state lines at some point. Doesn't mean that he had to do it, but at some point that the guns in their existence they had come across a state line. That's in and affecting commerce.

And that before all this happened on July 11th, he had previously been convicted of this felony.

Now, the evidence is -- what would be proved at trial is that this Defendant knew a man named Allan Bartelson from Vermont, and that they had had a long-time business relationship. And in the course of that relationship, they had spoken many times on the phone. They had met many times. The business involved the trading by Bartelson of

**PAGE 15 OF THE CHANGE OF PLEA TRANSCRIPT**
*HEARING DATE: 1st OCTOBER 2003*