IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LUIS OLIVERA | ) | |
| | ) | C.A. No. 06-0412S |
| v. | ) | CR No. 03-70-01S |
| | ) | |
| UNITED STATES OF AMERICA | ) | |

GOVERNMENT'S OBJECTION TO PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

## I. Introduction

Petitioner Luis Olivera has alleged nine grounds that he argues each entitle him to relief under 28 U.S.C. §2255. His motion should be denied and dismissed.

## II. Statement of the Case

On August 6, 2003, a federal grand jury in the District of Rhode Island returned a three-count indictment against defendant-appellant Luis Olivera and Robert Camera. Count 1 charged that on July 11, 2003, Olivera and Camera conspired to distribute cocaine. Count 2 charged that they distributed cocaine on the same date. Count 3 charged that they possessed four handguns as convicted felons, also on the same date.

On October 1, 2003, Olivera and his attorney signed a plea agreement in which Olivera agreed to plead guilty to Counts 2 and 3 and the government agreed to move for the dismissal of Count 1. (Plea Agreement at ¶¶ 1, 2 & 13.)

At the October 1 plea hearing, the government recited the following offense facts in relevant part. Olivera lived at 81

Hawkins Street in Providence. (10/1/03:19.) Olivera and Allan Bartelson of Vermont had a longstanding arrangement whereby Bartelson would supply Olivera with guns and Olivera would provide Bartelson with cocaine in exchange. (10/1/03:15-16.) Bartelson was eventually arrested with cocaine while driving back to his home and he agreed to cooperate against Olivera. (10/1/03:16.)

On July 1, 2003, Bartelson made a recorded phone call to Olivera in which the two agreed that Bartelson would provide Olivera with "9's and 38's just like before" but that Olivera would give him less than the standard amount of cocaine in return because the guns were "warm" or stolen. (10/1/03:16-17.) In a July 10 recorded call, Bartelson told Olivera that he would arrive the next day and that he had "those two 38's and two 9's." (10/1/03:17.) Olivera replied that he only had enough cocaine to buy two of the guns, that he preferred the smaller two, and that he would give Bartelson one and a half ounces for each gun if Bartelson also contributed $2,000 in cash. (10/1/03:17-18.)

On July 11, Bartelson and an undercover ATF agent drove to a parking lot near Olivera's house, where Bartelson made a phone call to Olivera. (10/1/03:18-20.) After further negotiations, Olivera ultimately agreed to trade the cocaine for four guns (instead of the two guns and cash promised earlier). (10/1/03:20-21.) Olivera then dispatched Camera to the parking

lot with 77 grams (or just shy of three ounces) of cocaine. (10/1/03:21-25.) Officers saw Camera leave 81 Hawkins on a bike and arrive at the parking lot, where he had a conversation with Bartelson and the agent. (10/1/03:21-22.) Camera said that he represented "Louie." (10/1/03:22.) Bartelson and the agent then expressed concerns about dealing with Camera instead of Olivera, prompting another phone conversation between Bartelson and Olivera. (10/1/03:22-23.) Eventually Camera gave Bartelson the cocaine and the agent gave Camera the four guns. (10/1/03:23-24.) As Camera rode off on his bike with the guns in a backpack, he was arrested. (10/1/03:24.)

Olivera was arrested shortly thereafter and he admitted his involvement in the drugs-for-guns transaction. (10/1/03:24.) Olivera had a prior felony record. (10/1/03:24-25.)

After the government had finished this summary of the facts, the court turned to Olivera and asked him whether he agreed that these were the facts of his case. (10/1/03:25.) Olivera said "No" and told the court: "Those aren't all the facts." (10/1/03:25-26.) The court then stated: "There may be other facts, but as to those facts that [the prosecutor] recited, do you agree that those facts are, in fact, true?" (10/1/03:26.) Olivera ultimately agreed that the government's summary was all true and that "there is no other facts." (10/1/03:26-27.)

The Presentence Report ("PSR") provided additional details

concerning the earlier transaction that had led to Bartelson's arrest and to his cooperation against Olivera. When he was stopped in Vermont on June 18, 2003, Bartelson possessed five ounces of cocaine. (PSR at ¶ 10.) Bartelson admitted to the police that he had obtained the cocaine from Olivera in exchange for $1,600 and a .9 mm pistol. (PSR at ¶ 10.)

The PSR also provided additional details concerning the charged July 11 transaction. After his arrest on July 11, Camera told an agent that (1) "he had obtained the cocaine from Luis Olivera and was directed by Olivera to meet a man [and] a woman at the Stop and Shop parking lot to trade the cocaine for four guns" and (2) Olivera had promised to pay Camera $100 for the service. (PSR at ¶ 10.) When Olivera was arrested at his house just after the July 11 transaction, he admitted that (1) he arranged the drugs-for-guns deal with Bartelson and (2) he used Camera as a courier to deliver the cocaine and retrieve the guns. (PSR at ¶ 10.) Olivera also identified the source of his cocaine supply as some men who had come to his house shortly before he sent Camera to the parking lot with the drugs. (PSR at ¶ 10.) Officers who conducted surveillance of Olivera's house had seen these men arrive in a Jeep Cherokee shortly before Camera departed from the house on his bike. (PSR at ¶ 10.)

In calculating the guideline sentencing range applicable to Count 3, the gun count, the PSR noted that the base offense level

was 20 under USSG § 2K2.1(a)(4)(A). (PSR at ¶ 30.) Because one firearm was involved in the June 18 transaction and four firearms were involved in the July 11 transaction, the total number of guns was between three and seven, triggering the two-level enhancement in USSG § 2K2.1(b)(1)(A). (PSR at ¶ 31.) A further four-level enhancement was required in light of USSG § 2K2.1(b)(5), which applies in relevant part when a defendant possesses a firearm "in connection with another felony offense." (PSR at ¶ 32.) The total offense level for Count 3 was therefore 26. (PSR at ¶ 37.)

Counsel for Olivera filed a narrow objection to the proposed four-level enhancement in paragraph 32 of the PSR. The objection was apparently based on the theory that the enhancement was inapplicable as a matter of law because Olivera constructively possessed the guns through Camera, his agent, and Camera himself never possessed the cocaine and guns simultaneously.

After the PSR was issued, Olivera moved pro se to dismiss his court-appointed attorney and to vacate his guilty pleas. (Docket Nos. 70, 71, 116 and 117.) At the outset of the first of two sentencing hearings, the court allowed Olivera to represent himself with the attorney acting as standby counsel. (2/13/04:3.) Olivera quickly changed his mind, however, and elected to proceed with counsel. (2/13/04:46.) Without endorsing the reasons given by Olivera for why his guilty pleas

should be vacated, the government moved to dismiss the drug distribution charge, Count 2, and the court granted that motion. (2/13/04:3-5,30-33,95.)[1] Pursuant to the plea agreement, the government also moved to dismiss Count 1, the drug conspiracy charge. (2/13/04:33.) That left only Count 3, the gun charge. The court denied Olivera's motion to dismiss that charge (2/13/04:28) and Olivera does not appeal that decision.

The sentencing hearings focused on a single issue: Olivera's objection to the four-level enhancement proposed in paragraph 32 of the PSR. Olivera's counsel confirmed that this was the only objection to the PSR and the court therefore accepted the balance of the PSR as undisputed. Sentencing Hearing (2/19/04:30,32,34. Bartelson testified that starting in about 2001, he came down from Vermont twice a month or so to obtain cocaine from Olivera, trading guns for the cocaine about half the time and paying money for the cocaine in other instances. (2/13/04:55-63.) Bartelson further testified that when he was arrested with cocaine on June 18, 2003, he had just obtained that cocaine from Olivera in exchange for a .9 mm pistol and $1,600 in cash. (2/13/04:63-71,84-87.) Bartelson also described the events surrounding the July 11, 2003 controlled

---

[1] The prosecutor explained his position on Count 2 in a letter which the court referred to at the first sentencing hearing (2/13/04:3-4), but that letter is not shown on the docket sheet and it is not part of the record on appeal.

transaction in which Olivera ultimately agreed to trade Bartelson cocaine in return for four handguns. (2/13/04:71-80.)

A Vermont police officer provided corroborating details concerning the June 18 transaction. (2/13/04:35-45.) An ATF agent provided corroborating details concerning the July 11 transaction. (2/19/04:4-18.) The government also introduced as exhibits: (1) laboratory reports concerning the cocaine recovered from the June 18 and July 11 transactions (Exhibits 1, 2, and 5); (2) a transcript of a July 10 conversation between Olivera and Bartelson (Exhibit 3); and (3) a transcript of a videotape of the July 11 deal in the parking lot (Exhibit 4). (2/13/04:40-45; 2/19/04:8-16.)

After the evidence was presented, counsel for Olivera repeated the narrow argument that he had made in his written objection to paragraph 32 of the PSR: that Camera (as agent for Olivera) never possessed the cocaine and guns simultaneously. (2/19/04:25,26.) The government then responded to that argument. (2/19/04:26-28.)

The district court found that there was "overwhelming" evidence that Olivera's firearm possession was "in connection" with the July 11 drug distribution and that it was also part of the broader drugs-for-guns conspiracy between Olivera and Bartelson. (2/19/04:32-34) The court stated that in reaching this conclusion it had refrained from considering "the

Defendant's prior plea with respect to Count II, which has subsequently been dismissed." (2/19/04:33) The court also stated that certain affidavits submitted by Olivera did not affect the analysis. (2/19/04:33-34.) The court ultimately imposed a 115-month sentence, at the top of the applicable range, and it gave a detailed explanation for this decision. (2/19/04:34-40.)

Olivera appealed his sentence to the First Circuit making three arguments:

1) a contention that the district court erred in finding that defendant's conduct in trading cocaine for guns made the guns connected to the underlying drug offenses for purposes of the four level enhancement in USSG 2K2.1(b)(5).

2) a contention that the four level enhancement should be reversed under the plain error standard in light of Blakely and

3) a contention that his lawyer failed to challenge a two-level increase in his sentencing guidelines level for the number of guns and thus rendered ineffective assistance.

The appeals court denied petitioner relief on the first two issues. It ruled that the ineffective assistance claim was premature and could be advanced by a motion under 28 U.S.C. §2255. Judgement entered August 4, 2005.

The instant §2255 motion was received by the District Court here on September 2006. The one year period to file a §2255

motion in this case began to run ninety days after the entry of judgment by the Court of Appeals. Thus it appears that the instant motion is within the one year time limit.

III. Analysis

The pertinent section of §2255 provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence is in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. §2255, ¶1.

Generally, the grounds justifying relief under §2255 are limited. A court may grant such relief only if it finds a lack of jurisdiction, constitutional error or a fundamental error of law. See United States v. Addonizio, 442 U.S. 178, 184-185, 99 S.Ct. 2235 (1979) ("[A]n error of law does not provide a basis for collateral attack unless the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice.") (internal quotations omitted).

Moreover, a motion under §2255 is not a substitute for direct appeal. United States v. Frady, 456 U.S. 152, 165 (1982). A movant is procedurally precluded from obtaining §2255 review of claims not raised on direct appeal absent a showing of both

"cause" for the default and "actual prejudice" - or, alternatively, that he is "actually innocent" of the offense for which he was convicted. Bousley v. United States. 523 U.S. 614. 622 (1998) (citations omitted). See Brache v. United States, 165 F.3d 99, 102 (1st Cir. 1999). However, claims of ineffective assistance of counsel are not subject to this procedural hurdle. See Knight v. United States, 37 F.3d 769, 774 (1st Cir. 1994).

Here, for reasons stated below, none of the claims raised by Petitioner entitles him to relief.

Of the nine items that petitioner argues should result in relief, seven could have been raised in his direct appeal and were not. Petitioner has not made a showing of both "cause" for the default and "actual prejudice" or, in the alternative, that he is "actually innocent" of the offense for which he was convicted.

The government will go through petitioner's arguments in the order they are set forth in his legal memorandum rather than his motion. The ineffective counsel claims are saved for last.

The first ground that petitioner sets forth is that the Court failed to advise him at the time of his plea that if he violated the terms of his supervised release he could be incarcerated, possibly resulting in a total period of incarceration exceeding the ten year maximum for 18 U.S.C. §922(g). Petitioner did not raise this issue in his direct

appeal and has made no case of "cause" as to why he did not. Bousely v. U.S., 253 U.S. 614, 621 (1998). Further, he has shown no actual prejudice.

The second ground for relief that petitioner addresses is his claim that the government breached its plea agreement in not recommending a two level reduction in the sentencing guideline level at sentencing. First, petitioner did not raise any objection at the sentencing. And second, defendant did not raise this issue in his direct appeal and, again, has failed to make a case for any "cause" for that omission. Nor has he shown any actual prejudice.

The third ground for relief petitioner relies upon is his contention that the government agents engaged in "extraordinary misconduct" by, he argues, engaging in "sentencing entrapment" by putting four firearms in the backpack when, he claims, he agreed to purchase two guns. He argues that this illegally raised his guideline sentencing level. Petitioner did not raise this issue in the District court. He has made no case for "cause" for not raising the issue in his direct appeal.

The fourth and fifth grounds are ineffective assistance claims dealt with later.

The sixth ground for relief petitioner adduces is his claim that the evidence does not support a conviction. Specifically, he argues that in a police report on the incident one of the

detectives referred to the firearms as "prop" firearms. Petitioner argues that this means that the weapons were not firearms in that they were not operable or designed to be operable.

Petitioner pled guilty to possessing four firearms. At that plea of guilty the government described the facts that it would prove at trial. Part of that description was the following:

> So Bartelson was taken down to the Providence Police Department by some agents from Vermont. The agents also brought four guns from Vermont, from -- there's a supply of guns that the Alcohol, Tobacco, and Firearms Agency uses for stings. They're working firearms. They are made to fire a bullet. And they came down, they're sent wherever the deal is going to be done.
>
> In this case, the firearms came down from Vermont in a different car from Bartelson with the agent. They were a Smith & Wesson .38 caliber; two Browning .9 millimeter semi-automatics; a colt Python .357 caliber. (Change of Plea Hearing, October 1, 2003 p.18-19).

Petitioner agreed that those facts were true. (Change of Plea p.26.)

Petitioner did not raise the issue on appeal and has given nothing but a bald assertion about the meaning of the word "prop." He has not made a case for "cause" as to why he did not appeal the issue. Furthermore, there is no contention that the evidence he relies upon is newly discovered. The word "prop" in the police report refers to one of ATF's own supply of firearms that are used in ATF stings. That is exactly what was described

in the government's recitation of the facts.

The seventh ground Petitioner argues is that his sentence was lengthened because the court considered as relevant conduct facts which were the basis for Counts I and II, which had been dismissed. That claim is procedurally barred because he did not raise it in his direct appeal and has set forth no "cause" why he did not.

The eighth ground Petitioner argues is that the court abused its discretion by vacating the plea to Count II without permitting him to vacate his plea to Count III. However, petitioner did not raise this argument in the district court, and he did not raise it on his direct appeal. He has failed to set forth any "cause" for that waiver and is procedurally barred from raising the matter by way of a 2255 motion.

In his ninth point Petitioner argues that the district court erred in accepting his guilty plea. He contends that he was not adequately informed of the element of "knowing possession." He is procedurally barred from raising this issue in his 2255 motion because he failed to raise it on appeal and has given no "cause" for that omission or any showing of actual prejudice.

In point (4) and (5) of his motion petitioner argues that he did not receive constitutionally adequate legal representation.

Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984), a defendant who claims that he was deprived of his Sixth

Amendment right to effective assistance of counsel must demonstrate:

> 1. That his counsel's performance "fell below an objective standard of reasonableness;" and
>
> 2. "[A] reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different."

Strickland, 466 U.S. at 687-88, 694 (1984). See Cofske v. United States, 290 F.3d 437, 441 (1st Cir. 2002).

The defendant bears the burden of identifying the specific acts or omissions constituting the allegedly deficient performance. Conclusory allegations or factual assertions that are fanciful, unsupported or contradicted by the record will not suffice. Dure v. United States, 127 F. Supp. 2d, 276, 279 (D.R.I. 2001) (citing Lema v. United States, 987 F.2d 48, 51-52 (1st Cir. 1993)).

In assessing the adequacy of counsel's performance:

> [T]he Court looks to "prevailing professional norms." A flawless performance is not required. All that is required is a level of performance that falls within generally accepted boundaries of competence and provides reasonable assistance under the circumstance.

Ramirez v. United States, 17 F. Supp.2d 63, 66 (D.R.I. 1998), quoting Scarpa v. Dubois, 38 F.3d 1, 8 (1st Cir. 1994) and citing Strickland, 466 U.S. at 688.

First, petitioner faults his lawyer's cross-examination of ATF Special Agent West, contending that counsel "abandoned" his

questioning "prematurely" when exploring the matter of how many handguns petitioner had agreed to buy. Petitioner goes on to complain that his lawyer "did not press the District Court to change its position vis a vis the number of guns properly attributable to defendant."

The fact is that petitioner pleaded guilty to possessing four firearms. That was not an open issue at sentencing. Defense counsel had objected to the report contending that the four guns were not possessed in connection with another felony. However, the number of guns was foreclosed by the plea of guilty to Count III.

Obviously counsel's performance did not fall "below an objective standard of reasonableness. Petitioner's argument is without merit. There is no likelihood that the Court was going to sentence defendant on the basis of two guns when he had pleaded to possessing four.

The government also observes that defense counsel brought out what he could from Agent West to support a contention that petitioner only agreed to take two guns from Bartelson. To have gone away further would have opened the door the agent getting into details harmful to petitioner. A strong taste of what was to come was the agent saying, "we didn't have any cash for him. There was no cash to be traded." (Sentencing Hearing p.19,20. Line 25-1.) Defense counsel was wise to drop the matter and move

to another issue.

In point 5 of his motion petitioner makes a second argument concerning ineffective assistance of counsel. He alleges that counsel told him in a letter that there was videotape of petitioner meeting with his co-defendant Camera before Camera delivered the cocaine to the agents in the parking lot. As proof of this petitioner points to a letter dated September 3, 2003, in which defense counsel sets forth the evidence of the conspiracy charge. In that letter counsel refers to tapes of telephone calls between Allen Bartelson, the ATF informant, and petitioner. Counsel refers two sentences later to tapes, calling them "surveillance tapes". There were recorded conversations in which the co-defendant Camera tells Bartelson that he had been sent by petitioner. These are the "surveillance" tapes. (2/19/04:12) Law enforcement observed petitioner meet with Camera at petitioner's house before Camera left with the cocaine. There would have been eyewitness testimony of that encounter at trial. There was video tape of the presence of Camera in the parking lot after he was observed leaving petitioner's house on his bicycle with the red back pack to pick up the guns. There may have been confusion over the word "surveillance" in the letter. The audiotaped conversations in the Stop & Shop parking lot were part of the surveillance by the team of agents.

In any event the evidence against petitioner was very

strong, including his taped telephone conversations, his fingerprint on the drug bag, the agent's observation of him meeting with Camera and Camera leaving his house, and petitioner's own statement to the police.

Furthermore, it should be noted, the conspiracy charge Count I, to which defense counsel's letter refers in his comment about "surveillance tapes", was dismissed as part of the plea bargain.

Counsel's performance did not fall below an "objective standard of reasonableness" and there is not a reasonable probability that but for the alleged errors, the result of the proceeding would have been different.

IV. Conclusion

For the foregoing reasons petitioner's motion should be dismissed and denied.

Respectfully submitted,

UNITED STATES OF AMERICA,
By its Attorney's

/s/ Zechariah Chafee

ZECHARIAH CHAFEE
Assistant United States Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401)709-5000
(401)709-5001(fax)
Zechariah.chafee@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2007, I caused the within Government's Objection to Petitioner's Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody to be electronically filed with the United States District Court for the District of Rhode Island, using the CM/ECF System. The following participant has received notice via ordinary mail and postage prepaid to:

I.D.#99710
Luis Oliver
Adult Corrections Institution
P.O. Box 8249
Cranston, RI 02920

/s/ Zechariah Chafee

ZECHARIAH CHAFEE
Assistant United States Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401)709-5000
(401)709-5001(fax)
Zechariah.chafee@usdoj.gov