IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | |
|---|---|
| * * * * * * * * * * * * | * CRIMINAL ACTION |
| USA | * NO. 03-70S |
| | * |
| VS. | * FEBRUARY 19, 2004 |
| | * |
| LUIS OLIVERA | * PROVIDENCE, RI |
| * * * * * * * * * * * * | * |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(SENTENCING)

APPEARANCES:

FOR THE GOVERNMENT: ZECHARIAH CHAFEE, ESQ.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903
528-5477

FOR THE DEFENDANT: EDWARD C. ROY, ESQ.
Federal Defender's Office
10 Weybosset Street
Suite 300
Providence, RI 02903
528-4281

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

# I N D E X


| WITNESS | | PAGE |
|---|---|---|
| MICHAEL WEST | | |
| Direct Examination by Mr. Chafee: | | 4 |
| Cross-Examination by Mr. Roy: | | 18 |

| GOVERNMENT'S EXHIBITS | ID | FULL |
|---|---|---|
| 3 - Transcript of audio tape: | 8 | 8 |
| 4 - Transcript of video tape: | 10 | 14 |
| 5 - Lab report: | 15 | 16 |
| DEFENDANT'S EXHIBITS | | |
| B - Affidavit: | | 21 |
| C - Affidavit: | | 21 |

THE COURT: We're here for the continuation of the hearing in the matter of U.S. versus Olivera.

Why don't we have counsel identify themselves for the record.

MR. CHAFEE: Zechariah Chafee for the Government.

MR. ROY: Good afternoon, Judge. Edward C. Roy for the Defendant.

THE COURT: Okay. I understand, Mr. Roy, that Judge Lisi may be issuing a decision in a case of yours at three o'clock, and that's not a problem. If we end up running to three o'clock, we'll just take a recess, you go do that, and we'll come back if we need to.

MR. ROY: Thank you, Judge.

THE COURT: All right. Mr. Chafee, you were going to call your next witness, I believe.

MR. CHAFEE: Agent West.

**MICHAEL WEST**, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: Michael West. W-E-S-T.

DIRECT EXAMINATION BY MR. CHAFEE

Q. Who do you work for, sir?
A. I'm a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.
Q. How long have you been an ATF agent?
A. Since 1992.
Q. Do you work here for the Providence office?
A. Yes, I do.
Q. Calling your attention to the time after June 18th, 2003, did you get involved with an investigation of Luis Olivera?
A. Yes, I did.
Q. Do you see Luis Olivera here in the court today?
A. Yes, I do.
Q. Would you point him out, please. Is he wearing the blue jump suit with the white T-shirt?
A. Yes, he is. He's at defense table.
Q. Sitting next to counsel?
A. Yes.

MR. CHAFEE: May the record reflect indicating Defendant, your Honor.

THE COURT: Yes.

Q. Okay. Now, how did you get involved with the investigation?
A. Our office had been contacted by agents from the

Vermont ATF office who had been conducting an investigation of an Allan Bartelson.

Q. Okay. Now, did that investigation have a Providence connection?

A. Yes, it did. Mr. Bartelson had allegedly been acquiring firearms in Vermont and bringing them to Rhode Island in exchange for cocaine.

Q. Did you learn the first name of the person that he was dealing with, Bartelson was dealing with?

A. Yes, we did. It was Louie.

Q. And did you do some investigation -- well, do you know whether Bartelson was showed some photographs of a house?

A. Yes, he was.

Q. What house was that?

A. The residence at 81-79 Hawkins Street. It's a duplex located in Providence, Rhode Island.

Q. Okay. And do you know what, if anything, Bartelson had to say about that place?

A. Mr. Bartelson provided directions to that address and stated that that was the location where he was trading his and acquiring his cocaine and trading his firearms.

Q. With Louie?

A. With Louie, yes.

Q. Did you do some further investigation?
A. Yes, I did.
Q. What did you determine?
A. We conducted surveillance on the location and identified Louie as a Luis Olivera.
Q. Is that the man sitting in court today?
A. Yes, it is.
Q. All right. From your contact with the ATF agents in Vermont, were you provided with a tape recording of a telephone call made by Allan Bartelson on July 10th, 2003?
A. Yes, I was.
Q. And did you listen to that tape?
A. Yes, I have.
Q. And who is Allan Bartelson talking to on the tape?
A. He's speaking with the Defendant, Luis Olivera.

MR. ROY: Objection, your Honor. Foundation. There's no indication on the record as to how this witness would know that.

MR. CHAFEE: We already have evidence on the record from Allan Bartelson himself, your Honor, that he was talking to Luis.

THE COURT: I think the objection relates to the tape itself, if I'm not mistaken. Is that what you're getting at?

MR. ROY: It does, your Honor.

THE COURT: We listened to a tape, but we don't know anything else about the tape.

Why don't you lay a little bit more foundation about the tape itself.

Q. You've said on the record here that the tape was made July 10th, 2003; is that right?

A. Yes, sir.

Q. And were there ATF agents involved in the making of that tape?

A. Yes, there were.

Q. From where did Bartelson make the phone call that was recorded?

A. In Vermont, in a jail facility in Vermont.

Q. And did -- you were provided with a copy of that tape; is that right?

A. Yes, I was.

Q. Did you listen to it?

A. Yes, I did.

Q. Could you hear Allan Bartelson on the tape?

A. Yes, I could.

Q. Could you hear another person he was talking to?

A. Yes, I could.

Q. Did you make a transcript of that tape?

A. A transcript was made, yes.

Q. Have you reviewed the transcript and compared it with the tape?
A. Yes, I have.
Q. I show you what I'm having marked as Government's 3.
(Government's Exhibit 3 was marked for identification.)
Q. I show you what's been marked Government's 3 for identification. I ask you to take a look at it. Do you recognize those two pages?
A. Yes, I do.
Q. What is that?
A. That is a copy of the transcript that was made of the taped call on July 10th, 2003.
MR. CHAFEE: I move the transcript full, your Honor.
THE COURT: Any objection?
MR. ROY: No objection, your Honor.
THE COURT: All right. Transcript, Government 3 will be admitted in full.
(Government Exhibit 3 marked full.)
Q. Calling your -- okay. Moving on. Now, that was just July 10th, 2003. Did an operation take place on July 11th?
A. Yes, it did.

Q. Give an overview of the operation to the judge, just how it started.
A. Based on the prearranged agreement between Bartelson and Louie, there was going to be an exchange made of four firearms for cocaine, and that was supposed to be delivered to Olivera. An undercover operation was arranged in which Bartelson would arrange for Olivera to meet him at another location in order to conduct the exchange. Present with Mr. Bartelson was an undercover ATF agent.
Q. Who was that?
A. Agent Sandra LaCourse.
Q. Sandra LaCourse. Okay. Was Bartelson brought down from Vermont?
A. Yes, he was.
Q. And was Agent LaCourse provided with some ATF firearms?
A. Yes, she was.
Q. And where did the car with LaCourse and Bartelson actually go, what place?
A. It was the Stop & Shop located on Branch Avenue in Providence.
Q. Were either Bartelson or LaCourse wearing transmitters that day?

A. Yes, they were.
Q. And so their conversations could be overheard in another location by ATF agents?
A. Yes.
Q. And was there an ATF crew with a video camera videoing the car --
A. Yes, there was.
Q. -- that held LaCourse and Bartelson?
A. Yes, sir.
Q. And were you in the Stop & Shop parking lot yourself?
A. No, I wasn't. I was in another location.
Q. Okay. Have you interviewed LaCourse in preparation for the trial of this case back in September?
A. Yes.
Q. And have you seen the videotape of the events that took place in the parking lot and heard the audio tape?
A. Yes, I have.

MR. CHAFEE: I'm having an item marked Government's 4 for identification, the defense counsel has a copy already.

(Government's Exhibit 4 was marked for identification.)

Q. Before I get into this, have you -- maybe I covered this. Did you listen to a recording of the conversation that took place at the car in the Stop & Shop parking lot?
A. Yes.
Q. And have you compared it -- actually, did you make a transcript of that recording?
A. Yes, I did.
Q. And did you review the videotape of what took place --
A. Yes.
Q. -- on July 11th in the Stop & Shop parking lot?
A. Yes, I did.
Q. I show you what's been marked Government's 4. I ask you to take a look at it. Do you recognize that transcript?
A. Yes, I do.
Q. Is that a portion of -- a transcript of the portion of the conversation in the parking lot?
A. Yes, it is.
Q. Now, there's -- on the transcript there's "UC" is one of the people involved. What does that refer to?
A. Undercover.
Q. Is that Sandy LaCourse, the agent?

A. Yes, it is.
Q. There's "BC," who does that refer to?
A. Bobby Camera.
Q. Okay. And there's -- I believe there's an "AB." "AB," who would that refer to?
A. Allan Bartelson.
Q. And is this the transcript of the conversation at the point where Bobby Camera or Robert Camera, the co-defendant, arrives in the parking lot?
A. Yes, sir, it is.
Q. From your conversations and viewing of the videotape, describe to the Court in just very brief terms what took place.
A. Mr. Camera left the 79-81 Hawkins Street --
Q. On a bicycle?
A. -- on a bicycle carrying a red backpack. He traveled down to the Stop & Shop on Branch Avenue. Ultimately met up with Agent LaCourse and Mr. Bartelson, introduced himself, informed the two that he had been sent by Louie to meet with them to do the deal.
At that time, Agent LaCourse was apprehensive about dealing with Mr. Camera because he was not the individual that Mr. Bartelson had normally dealt with. He was not Louie.

During their meeting, Camera and Bartelson decided to call Louie. And basically, during that call, Louie told them to go ahead. "He's the guy I sent down there to" -- so he vouched for Camera.

Q. Did Camera give Bartelson the drugs?

A. Yes. He gave him a plastic bag that had another plastic bag with cocaine in it, and put it in Bartelson's back pocket.

At that time, Agent LaCourse took the backpack that Camera had provided to her and put the four firearms into the backpack, handed the backpack back to Camera who then got on his bike, proceeded to -- started to leave, and at which point he was arrested.

Q. Was there an ATF -- was there a task force involved in this operation involving agents and officers from different law enforcement entities?

A. Yes, there was.

Q. Were there some agents from that task force watching 79-81 Hawkins Street?

A. Yes, there were.

Q. Have you spoken to them?

A. Yes, I have.

Q. What did you learn about what went on back at the Hawkins Street address before Camera left?

A. Prior to Camera leaving, agents were watching the residence. They saw the Defendant and a white male who was subsequently identified as Robert Camera at the residence. They saw a maroon Jeep Cherokee arrive at the residence and two Hispanic males exit that vehicle, meet with the Defendant. A short time later they got back in their vehicle and left. Not long after that, Mr. Camera got on his bicycle and headed down towards the Stop & Shop.

MR. CHAFEE: All right. I move Government's 4 full.

THE COURT: Any objection?

MR. ROY: No, your Honor.

(Government's Exhibit 4 marked full.)

Q. Have you interviewed -- as the case agent in this case, you are one of the co-case agents for this case, are you not?

A. Yes, I am.

Q. Have you interviewed the agents and officers involved in bringing the cocaine that Camera gave Bartelson, and what was done with that cocaine?

A. Yes, I have. I have spoken to them. The cocaine was -- Bartelson took it out of his pocket, placed it in the undercover vehicle. Agent LaCourse

secured it, handed it to Special Agent Montero of ATF, who, in turn, provided it to Sergeant Correia of the Providence Police Department. Sergeant Correia gave it to Detective Gregory Sion who conducted a field test on it and weighed it and then submitted it for evidence.

The baggies were provided to Detective Cornell of the Providence Police Department, who, in turn, conducted a fingerprint analysis on the baggies and was able to lift a fingerprint that matched one of the fingerprints of the Defendant, Olivera.

Q. And was the powder submitted to the Rhode Island Forensic Science Laboratory for the drugs, chemistry section?
A. Yes, there was.
Q. And was there a laboratory test done on it and a weighing done?
A. Yes, there was.

(Government's Exhibit 5 marked for identification.)

MR. CHAFEE: I have this item marked 5 for identification.

MR. ROY: No objection to full.

MR. CHAFEE: Move it full, your Honor.

MR. ROY: No objection to full, your Honor.

THE COURT: All right. Government 5 will be admitted in full.

(Government Exhibit 5 marked full.)

Q. Is this the lab report -- I'm showing you 5 full. Is this the lab report on the cocaine that was given by Camera to Bartelson?

A. Yes.

Q. And what is the weight?

A. It's 77.6 grams.

Q. And is it positive for cocaine?

A. Yes, it is.

Q. Okay. After Camera was arrested in the parking lot, what took place back at -- well, just to cut it short, was the Defendant arrested?

A. Yes, he was.

Q. Shortly thereafter?

A. Yes, he was.

Q. Back at the house at 79-81 Hawkins Street?

A. Yes, he was.

Q. And was the Defendant interviewed?

A. Yes, he was. At the Providence police station.

Q. And who interviewed him?

A. Myself and Special Agent Eric Yankee.

Q. And did he say anything about dealings with Bartelson?
A. Yes, he did.
Q. What did he say about that?
A. He said that he had spoken with Bartelson a few weeks prior and arranged to have a firearm, two firearms brought down to him, which he, in turn, gave to his brother, Victor. He also said that he had spoken to Bartelson and -- this guy Al actually is what he said.
Q. He called him Al?
A. He called him Al. Yes, I'm sorry. This gentleman, Al, from Vermont, who was going to come down with some guns and cash. And he was setting up the deal for Bobby to get the guns. He got the cocaine from individuals he knows in Central Falls, because they wouldn't deal with Bobby. He was essentially just acting as a middleman.
Q. That's what he claimed; is that right?
A. That's what the Defendant claimed, yes.
Q. Was Robert Camera interviewed?
A. Yes, he was.
Q. What did he say about the deal?
A. He was interviewed by Special Agent Troiano, and he said that Louie had asked him to deliver the

cocaine to this guy at the Stop & Shop parking lot, and then get some guns from him, and then come back.

Q. What did Camera say he'd be paid for that?

A. I believe it was $100.

Q. So the Defendant admitted that he had -- this Defendant admitted he obtained the cocaine and sent it with Camera to the parking lot; is that right?

A. Yes, he did.

MR. CHAFEE: I have no further questions.

THE COURT: Cross?

MR. ROY: Could I have a moment, please, Judge.

THE COURT: Yes.

**CROSS-EXAMINATION BY MR. ROY**

Q. Good afternoon, Special Agent.

A. Good afternoon.

Q. Did Mr. Camera give you an address?

A. He said he lived -- he gave it to Special Agent Troiano. He said he lives at 79 Hawkins Street.

Q. Is that the same building that Mr. Olivera was claimed to have lived in?

A. Yes, it is.

Q. Okay. Were you involved at all in the operation

and plaining before it went down on the 11th of July?
A. Yes.
Q. I read the transcript of the July 10th conversation. And correct me if I'm wrong, but the planning was for two guns to be brought down by Mr. Bartelson?
A. Yes, sir.
Q. And at some point in time, that changed to four guns?
A. Yes, sir, it did.
Q. Who made the decision to change it from two to four?
A. I'm not sure exactly who it was.
Q. Because I read the transcript and again, please correct me if I'm wrong, as I read that transcript of the July 10th conversation, Mr. Olivera and Mr. Bartelson had agreed to trade $2,000 cash and two guns for some cocaine, correct?
A. That's correct. Yes.
Q. And then Mr. Bartelson showed up with four guns?
A. That's correct. And no cash, yes.
Q. Does anybody know why -- do you know why that happened?
A. We didn't have any cash for him. There was no

cash to be traded.

Q. And -- all right. That's fine. Now, the interview that you had of Mr. Olivera when he talked about the incident, was any of that reduced to writing?

A. Special Agent Yankee, he created a report which synopsized --

Q. Was Mr. Olivera's statement itself reduced to writing?

A. No. He would not provide a written statement.

MR. ROY: That's all I have. Thank you.

MR. CHAFEE: I have no further questions.

THE COURT: Okay. You may step down Agent West. Thank you very much.

Do you have any further witnesses?

MR. CHAFEE: That's the Government's case, your Honor.

THE COURT: All right. Very good. Mr. Roy, do you want to present any evidence?

MR. ROY: Your Honor, again, if I could have one moment to speak to the Defendant.

THE COURT: Certainly.

MR. ROY: Thank you, Judge.

Your Honor, the Defendant informs me that he wishes to provide two items the Court already

has, the affidavit of the co-defendant, Robert Camera, and I believe there was a second affidavit by someone that Defendant referred to as Georgie.

THE COURT: I have the two affidavits that were previously submitted, and I can take them in as exhibits for this hearing. It will be Defendant's B and C. Camera will be B and the other affidavit will be C.

(Defendant's Exhibits B and C marked full.)

MR. ROY: Thank you, Judge. If I could have one moment again, Judge.

THE COURT: Take as much time as you need.

MR. ROY: Judge, the Defendant has just now informed me that the individual who provided the affidavit, the Defendant believes that individual would testify. I don't have a last name. I think he knows where he lives, but he wants the witness to come into court and testify. Obviously, I was unaware of that until just now so obviously I can't do that right now.

THE COURT: Why don't you make an offer of proof as to what that testimony would be so I can --

MR. ROY: I believe it would be the

affidavit that the Court already has. It's that individual, Georgie. The Defendant indicates to me that the witness would testify that he was present in the backyard and that the drugs came from Camera's house, not Mr. Olivera's house.

THE COURT: Can I see the affidavit, please.

Is there anything other than what's contained in the affidavit that this witness, George Gomes, would offer?

MR. ROY: I have to apologize. I haven't read the affidavit, Judge.

THE COURT: Why don't you take a look at it and review it with the Defendant. Let me know if there's anything beyond what's in the affidavit that he expects him to say.

MR. ROY: Thank you, Judge.

Judge, the Defendant wants to attribute to this witness statements that are not in the affidavit. And again, to be candid with the Court, I haven't spoken with Mr. Gomes so I'm not sure what the proper remedy is.

THE COURT: I'm not sure I followed what you said.

MR. ROY: In other words, I guess the line

of question the Court I guess was asking me about was there are additional facts that the Defendant wants to put on from this witness.

THE COURT: Can we get a little idea of what that would be? I mean, in the way of an offer of proof so I can --

MR. ROY: Can we ask the Defendant to speak? I have no idea, Judge, to be quite candid with the Court. The Defendant is in a better position. Does that make sense or --

THE COURT: Well, I think it's better if you speak to him, and you relay to me what it is.

MR. ROY: Could I have one moment, please, Judge. Again, I apologize.

THE COURT: That's all right.

MR. ROY: Judge, in speaking with the Defendant without the benefit of interviewing George Gomes, it appears that Mr. Gomes would say that Robert Camera was dealing drugs from 79 Hawkins Street. And then other than that, it appears that the affidavit would comprise his testimony.

THE COURT: That's in the affidavit.

MR. ROY: It is, Judge. Correct.

THE COURT: Okay. Well, it doesn't appear

to me that there's anything beyond what's in the affidavit that Mr. Gomes would testify to. And I don't think Mr. Chafee has indicated that he feels a need to cross-examine Mr. Gomes.

MR. CHAFEE: I don't, your Honor.

THE COURT: So I think I can just accept the affidavit as the evidence that would be presented by Mr. Gomes, and I don't see a need to adjourn the hearing for purposes of putting him on the stand given that we already have everything that he would say in this affidavit.

MR. ROY: That's fine, your Honor. May I approach the clerk?

THE COURT: Sure. All right. Is there any other evidence that you wish to put on of any kind?

MR. ROY: The only thing I would do, your Honor, I would move the two affidavits as full exhibits, that is Exhibits B and C.

THE COURT: Yes. They're accepted in full.

MR. CHAFEE: I know we're about to argue, your Honor. Can I look at the affidavit, the Gomes affidavit.

THE COURT: Okay. Is there anything

further, or do you want to argue it now?

MR. CHAFEE: I'd like to argue, your Honor.

THE COURT: Okay. Let's do it.

MR. CHAFEE: I ask the Defendant go first. It's his objection.

MR. ROY: Your Honor, I guess what is before the Court is the four-level increase in the presentence report for the guns being possessed in connection with another felony, the allegation being that the cocaine that was seized from or seized from Allan Bartelson after the arrest, whether or not that is includable for a four-level increase.

When I drafted my objection, your Honor, it was my feeling that the reason this should not be included is that for this Defendant he never actually possessed the guns. And once the guns were transferred by ATF to Camera for the cocaine, they were never possessed simultaneously, your Honor, I guess is the argument.

And although the Government has put on a great deal of evidence regarding the prior dealings between Mr. Olivera and Mr. Bartelson, I almost think it's not important. What really is

important is what took place outside that Stop & Shop. And once the guns were exchanged for the drugs, Camera, being alleged to have been Olivera's agent, was never simultaneously in possession of one for the other.

So it's for that reason, your Honor, we felt that that increase is inappropriate. It's not as if the guns and the drugs were both used at the same time. And I think the policy underlying that increase is that it's more dangerous for defendants to run around the streets of Providence with guns to embolden them, so to speak, for drug dealing activities. And that was not the case here.

So because this is a reverse sting, it really does not have the same policy implications as if someone was using the guns to defend themselves, which I think is the real reason underlying the increase. Thank you.

THE COURT: All right. Thank you, Mr. Roy. Mr. Chafee.

MR. CHAFEE: At issue here is whether the Defendant should be assessed a four-point enhancement in his sentence because he possessed the guns. Now -- or because he possessed the guns

in connection with a cocaine delivery.

The relevant guideline section is Section 2K2.1(b)5. That reads: "If the Defendant used or possessed any firearm or ammunition in connection with another felony offense," that's what we're going under here.

Now, I dismissed Count II, the charge that he delivered, aided and abetted the delivery of cocaine.

So what I sought to do here today and the previous day we heard testimony was to establish by credible evidence before your Honor that there was another felony committed, and that is the same one that the charge of which I dismissed. But I'm now putting on independent evidence or have put on independent evidence that there was a cocaine deal and that this Defendant possessed those firearms in connection with another felony offense.

Now, he raised an objection to that in which he says, this is quoting from his objection, "The Defendant's offense level for the count of being a felon in possession is increased because of the application of a four-level increase based upon the fact that the Defendant possessed or transferred a firearm in connection with another

felony offense. In this case, the Defendant only constructively possessed the firearms in question, and the firearms were never transferred for cocaine." That's what he's claiming. "Once the co-defendant transferred the cocaine, the ATF undercover agent transferred the firearms to the co-defendant. Once possession was complete by the co-defendant, no additional felony occurred." That's his argument. So now I'm confronting that.

That doesn't get around the wording of the guideline section at issue, which says, "If the defendant used or possessed any firearm." Well, there were definitely four firearms involved. That's the evidence. He's pleaded guilty to possessing them so that's not at issue.

Now, the only issue is are they in connection with another felony. There's ample, credible evidence on the record of this hearing that there was another felony committed, that is, the distribution of cocaine. The Defendant admitted it in his statement to the police. We had Allan Bartelson testifying to his phone call. We have the transcripts of the phone call in which the deal is set up. We have Allan Bartelson saying he had discussions with Robert Camera and

that Camera -- he knew Camera as the Defendant's runner and that Camera brought, indeed brought the cocaine that had been negotiated over the telephone. So the evidence is overwhelming that this was a cocaine deal.

THE COURT: What was Count I, conspiracy?

MR. CHAFEE: Count I was the conspiracy.

THE COURT: So wouldn't you also be arguing that another felony offense which was committed was not just the distribution but also the conspiracy?

MR. CHAFEE: Absolutely. I hadn't thought of it, but thank you, your Honor. That makes perfect sense as well. There definitely was a conspiracy between Camera and this Defendant to deliver the cocaine and pick up the guns.

So in connection with another felony. In fact, it's in connection with two felonies as your Honor points out. I think the evidence is overwhelming.

I put in independent evidence. He didn't really challenge my -- what I wanted to have on the record is evidence independent of this Defendant, this Defendant's plea allocution in which he admitted dealing the cocaine. I wanted

independent evidence on the record because we dismissed that charge.

I ask your Honor to rely on my prosecution version of the facts, which is unchallenged and is in the presentence report, and also the evidence that has been adduced here at this hearing and set aside completely what Defendant may have said at his plea allocution to the plea, to the charge which has been dismissed.

The evidence is overwhelming this was in connection with, it was a drugs for guns deal. It's clear as a bell.

THE COURT: All right. Thank you, Mr. Chafee. Okay. I'm prepared to rule on this and move on to the rest of the proceeding today unless somebody has some reason why we should not do that.

So what's before me at the moment is the Defendant's objection to the portion of the presentence report, which is contained at paragraph 32 of the presentence report.

Before I get to that, let's just be clear. I think the record is clear that all counsel received a copy of the presentence report, everyone has reviewed the presentence report, and

I have dealt with the other earlier proceedings in this matter.

The only issue that is in dispute with respect to the contents of the presentence report is the objection that is before me at this time. And that is the four-level adjustment. Is that a fair statement? Does everyone agree with that?

MR. CHAFEE: That's the Government's perception of it, your Honor. That's what is at issue.

MR. ROY: I agree, Judge.

THE COURT: Okay. So the only thing -- so I'm going to accept the presentence report as my findings of fact for purposes of this proceeding and move on now to deal with the objection to paragraph 32.

I would also note, before I get to that, that we have dealt with the Defendant's motion to vacate his plea as to Count III. I have denied that motion.

The Government has voluntarily dismissed Counts I and II; Count I being the conspiracy count, and Count II being the distribution count.

Do I have that backwards, or do I have that right?

MR. CHAFEE: That's the way it is.

THE COURT: Is that right? Okay. That's right. So all that remains then is Count III and paragraph 32 is the enhancement under guideline section 2K2.1(b)5.

Mr. Chafee quoted the guideline section, and it states as follows: "If the Defendant used or possessed any firearm or ammunition in connection with another felony offense or possessed or transferred any firearm or ammunition with knowledge, intent or reason to believe that it would be used or possessed in connection with another felony offense, increase by four levels."

In this case, there is no question that the Defendant possessed a firearm. He has pled guilty to that offense.

So the only question that remains is whether the possession of the firearm, which he has pled guilty to, was done in connection with another felony offense.

The Government has put on substantial evidence to show that the possession of the firearm was -- or that the firearm was possessed in connection with the felony offense of distribution of cocaine, and also that there was a

conspiracy, which is a separate felony offense previously charged as Count I in play in connection with the possession of the firearm.

It is my opinion that the evidence that has been presented overwhelmingly demonstrates that the firearm in this case was possessed in connection with both the felony offense of possession with intent to distribute cocaine, previously Count II, as well as conspiracy to deliver the cocaine, which was previously Count I.

In making this decision, I rely only on the evidence that has been submitted in the course of this sentencing proceeding, and I am not relying and have completely discounted the Defendant's prior plea with respect to Count II, which has subsequently been dismissed.

I have considered the affidavits submitted by the Defendant, the Camera affidavit and the Gomes affidavit. For the most part, these affidavits are not relevant. The Gomes affidavit is, even if it all was true, doesn't really exonerate the Defendant. And the Camera affidavit I do not believe contradicts the Government's case in any significant way. And beyond that, I believe is inconsistent with Camera's own

statements.

So the long and the short of it is the evidence, in the Court's view, is overwhelming that the firearm was possessed in connection with two separate felony offenses as I outlined above. And therefore, the four-level adjustment under the guideline section 2K2.1(b)5 is appropriate.

Now, having said that, the adjusted offense level in this case is, therefore, a 26, and the criminal history category for the Defendant is a 4.

Do the parties agree that the offense level is a 26, and the criminal history category is, in fact, a 4?

MR. ROY: I agree, your Honor, that the proper offense level is 26.

THE COURT: Government?

MR. CHAFEE: Yes, your Honor.

THE COURT: All right. So I'll now hear from both parties with respect to the appropriate sentence in this case.

I'll note that the guideline provisions call for 92- to 115-month sentence of incarceration and supervised release of two to three years.

Okay. I'll hear from the parties on the appropriate sentence.

MR. CHAFEE: The Government is going to recommend a sentence at the middle of the guideline range, your Honor. The range is 13 months. So there's a difference between the high and the low of 13 months. So adding six months to the low end of 92 would come up to 98. I don't think there's anything that put him higher, or nothing in particular to recommend that he go lower.

THE COURT: All right.

MR. ROY: Your Honor, I'll recommend the Defendant get the low end of the guidelines. When we read the presentence report and when I sat in for the interview of this Defendant, I was struck by his upbringing and the fact that he was raised in poverty in the projects, and apparently he didn't have much of a shot to do much with his life.

So I think you can understand why the Defendant sits where he is today with these type of charges.

And further, your Honor, he has I think three young children -- four young children? Four

children.

He has a number of young children, your Honor, that will need his support. And the longer that he's kept in jail, the more they're going to suffer. So I would ask the Court for those reasons to impose the low end of the guidelines range.

MR. CHAFEE: I did the wrong math, your Honor, but I'll stick by my recommendation.

THE COURT: Does the Defendant want to say anything before I impose sentence.

THE DEFENDANT: No, your Honor. Just that I'm sorry. That's it. There's really no excuse.

THE COURT: Okay. Well, please stand, Mr. Olivera.

Mr. Olivera, in spite of the Government's recommendation to go to the middle of the guidelines, I'm not going to agree to that. And my practice is that I start in the middle, and if there are circumstances which warrant moving to the low end of the guidelines, I will do that. If there are circumstances moving to the upper end of the guidelines, then that's what I'll do.

In this case, while I understand that you had a difficult upbringing, just about every

defendant that we see in this Court has had a difficult upbringing. All right?

What has happened in this case, in my view, is a demonstration of your lack of respect for the criminal justice system and your lack of respect for this Court.

You have vacillated back and forth about whether to plead guilty several times. We impaneled a jury only to have you change your mind and plead guilty. After you pled guilty, you attempted to delay the process by changing lawyers.

We convened numerous times in order to deal with your case only to have you shift tactics with the Court, and every turn I've given you your shot. And I think I've always been straightforward and fair with you.

You had an opportunity to take responsibility for your actions, and you chose not to do that.

You have filed pleadings pro se with this Court that are filled with misrepresentations, inaccuracies, accusations against your lawyer, accusations against the Court, things which just are not true and which you have no basis for

saying, and which, in fact, you can be sanctioned for, frankly, for filing those kinds of pleadings with the Court. You can't just file things with the Court where you say whatever it is you want to say as if it happened, when it didn't.

And now, we come to this hearing today, and you've been trying to persuade me all along you knew nothing about this, and that's why you wanted to change your plea and so forth and so on. And today we get evidence in the course of this sentencing that makes it so overwhelming clear that you were essentially leading this conspiracy and this transaction to trade firearms for drugs.

So you weren't telling me the truth when you addressed me in the context of your change of plea hearing, which is consistent with all of the things that you have done in the course of this proceeding. So I take all of that into consideration.

And in addition to that, I take into consideration the fact that you are facilitating not just in this case, but it's obvious from the testimony that you have been doing this for some time, doing exchanges of drugs for guns.

I've read these transcripts, and you

wanted to make sure the guns were as small as possible. Obviously, you want that so that they're more marketable; they're easier to conceal. And those guns go out on the street.

So you are part of a significant channel of trade which takes guns or takes drugs and trades them for guns and puts those guns out into the streets of Providence and surrounding communities.

So I have to factor all of that in in determining where along the guideline range your sentence should fall. And I can see no reason, given all that I have looked at in the course of this case and what I have observed in terms of your own demeanor and your approach to this case, I see no reason not -- in fact, I believe it makes sense to go to the top end of the guideline range.

Maybe you will understand that the kind of activity that you have engaged in in this case is most serious and that you will finally come to realize that engaging in this kind of activity is something that just is not going to be tolerated.

And I think any judge sitting in my position would react to this case just this way. You cannot engage in exchanging drugs for guns and

not expect to be treated harshly by the system.

So I'm going to impose here a term of imprisonment of 115 months. I'm going to require a term of supervised release of three years. I will not impose a fine, because I don't believe there are any assets to pay a fine. Special assessment of $100 for the one count will be required.

As a special condition on the term of supervised release, I'm going to require that you participate in a program of substance abuse, which may include drug testing, to determine whether you have reverted to the use of alcohol or drugs.

Now, Mr. Olivera, you have the right to appeal your sentence if you believe that -- or appeal your conviction, that is, if you believe for any reason that your plea was unlawful or involuntary or some other fundamental defect in the proceeding was not waived by your plea.

You also have the statutory right to appeal your sentence if you believe the sentence I've imposed here is illegal.

Is there anything else we need to take up?

MR. ROY: Judge, the Defendant wanted me to mention that, asking the Court to consider

putting on the judgment that the Court recommend that he be incarcerated at a facility that had an appropriate drug treatment program.

THE COURT: I'm happy to do that. I will recommend that the Defendant be incarcerated at a facility with an appropriate drug treatment program, and I will also recommend that the Defendant be incarcerated at a location where he can be visited by his family.

I recognize the fact that you do have children, and I do not want to -- I need to tell you, though, that the Bureau of Prisons makes these decisions, not me. All I can do is recommend that you be incarcerated in a place close to your home. And I will do that. But you need to understand the Bureau of Prisons does not always follow those recommendations. But I do recommend you be given both of those -- that both of those things be given consideration with respect to your placement.

Anything else that needs to be dealt with?

MR. ROY: Your Honor, the Defendant indicates he wants to file an appeal. I can draft a notice of appeal.

THE COURT: Mr. Roy knows how to take care

of that.

The other thing I would just say to you, Mr. Olivera, is that with good time you'll serve about 85 percent of that sentence. All right?

You also have other opportunities available to you while you're incarcerated, and I'm hopeful that you'll take advantage of those opportunities, educational opportunities and development of skills and so forth.

I don't have any desire to see you fail when you get out. In fact, it's the opposite. I hope that when you get out that you've got the desire and the tools to turn your life into a different direction. And I think if you've got kids that should be a motivation enough for you to go in the right direction. But the purpose of this sentence is to punish you for what you have done and also to serve as a deterrent to you from ever engaging in this kind of activity again. But when you boil it down, you're going to be out of jail in -- you're still going to be a very young man when you get out of jail, and you're going to have some big choices to make in your life about which direction you're going to go in. If you don't go in the right direction, the next time is

going to be for the rest of your life or thereabouts.

So you've got to make some decisions while you're away in prison about where you're going to take your life.

All right. We'll be adjourned.

(Court adjourned at 2:45 p.m.)

# C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Anne M. Clayton

Anne M. Clayton, RPR

April 19, 2004

Date