IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | |
|---|---|
| USA | CRIMINAL ACTION NO. 03-70S |
| VS. | OCTOBER 1, 2003 |
| LUIS OLIVERA | PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(CHANGE OF PLEA)

APPEARANCES:

FOR THE GOVERNMENT: ZECHARIAH CHAFEE, ESQ.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903
528-5477

FOR THE DEFENDANT: EDWARD C. ROY, ESQ.
Federal Defender's Office
10 Weybosset Street
Suite 300
Providence, RI 02903
528-4281

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

THE COURT: Are we ready to proceed?

MR. ROY: Defendant is ready, your Honor.

THE COURT: Okay. Let's have, since we're now on Defendant Olivera, just have counsel identify themselves for the record.

MR. ROY: Edward Roy for the Defendant, your Honor.

MR. CHAFEE: Zechariah Chafee for the Government.

THE COURT: Now, we're here, Mr. Olivera, because I understand that you wish to plead guilty.

THE DEFENDANT: Yes.

THE COURT: Okay. I'm in receipt of a plea agreement, which you and your attorney have signed, as well as it has been signed by the Government, and that plea agreement will be made part of the record.

I'm going to ask, Mr. Olivera, that you now stand and be sworn in by the clerk.

**LUIS OLIVERA**, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: Luis Olivera, O-L-I-V-E-R-A.

THE CLERK: Thank you. You may be seated.

THE COURT: Go ahead and stand back up, Mr. Olivera. I'm going to ask you some questions. All right?

EXAMINATION BY THE COURT

Q. You understand, Mr. Olivera, that you are now under oath. You're expected to answer all of my questions truthfully. If you do not answer my questions truthfully, it could result in prosecution against you for perjury or obstruction of justice or making a false statement. Do you understand that?

A. Yes.

Q. What's your full name?

A. Luis Rafael Olivera.

Q. How old are you?

A. Twenty-seven.

Q. Twenty-seven? How far did you go in school?

A. Ninth grade.

Q. Have you been treated recently for any mental illness or addiction to narcotic drugs of any kind?

A. No.

Q. Are you currently under the influence of any drugs, medication, alcoholic beverage of any kind?

A. No.
Q. Have you received a copy of the indictment in this case, that is the written charges against you? You heard me read that indictment to the jury earlier in this proceeding.
Have you received a copy of that and fully discussed it with your attorney?
A. Yes, I did.
Q. Are you fully satisfied with the representation that you've been provided by Mr. Roy in this case?
A. Yes.
Q. Is your willingness to plead today the result of the discussion that you've had with Mr. Roy and with the attorney for the Government, Mr. Chafee?
A. I guess I am myself.
Q. And yourself. Yes.
A. Yes.
Q. Did you have an opportunity to read and discuss the plea agreement that you signed with Mr. Roy before you signed it?
A. Yes.
Q. Does the plea agreement represent in its entirety the understanding that you have with the Government?
A. Yes.

Q. Do you feel you understand the terms of the plea agreement?
A. He explained it to me.
Q. Okay. Can you tell me in your own words what you believe this plea agreement means for you?
A. I'm pleading guilty.
Q. What does it mean for you? What's going to happen?
A. Do jail time.
Q. Okay. And you understand what you're pleading guilty to?
A. Yes.

THE COURT: All right. I'm going to ask Mr. Chafee for the Government to summarize the terms of the plea agreement. I want to make sure you listen carefully to what he says. I'm going to ask you a few questions about that.

MR. CHAFEE: Your Honor, the Government -- excuse me, the Defendant has agreed to plead guilty to Count II, which charges aiding and abetting the distribution of cocaine; and to Count III, which charges possession of a firearm after a felony conviction.

The Government agrees to move at sentencing for the dismissal of Count I, that is

the conspiracy to distribute cocaine.

For purposes of determining the offense level, the Government agrees to recommend a two-level reduction in the offense level for acceptance of responsibility.

The Government is free to recommend any combination of supervised release, fines and restitution which it deems appropriate.

The maximum statutory penalties for each count of the indictment for which the Defendant is pleading are as follows: 30 years imprisonment, a fine of up to $2 million, a term of supervised release from three years and up to life and a mandatory special assessment of $100.

On Count III, the firearms charge, the maximum is ten years imprisonment, a fine of $250,0000, a term of supervised release from three years and up to life, and a mandatory special assessment of $100.

**BY THE COURT**: (Continuing)

Q. Mr. Olivera, did you listen carefully to what Mr. Chafee outlined as the terms of the plea agreement?

A. Yes.

Q. Do you agree those, in fact, are the terms of the

plea agreement that you have with the Government?

Let me ask you again. Do you agree those are, in fact, the terms of the plea agreement that you have with the Government?

A. Yes.

Q. Anyone made any other promises to you or assurances to you of any kind to induce you to plead guilty?

A. No.

Q. No?

A. (Witness shakes head in the negative.)

Q. Now, do you understand that the terms of this plea agreement are merely recommendations to the Court and that I can reject those recommendations or I can accept those recommendations, but I can reject them without permitting you to withdraw your plea of guilty, and I may impose a sentence that is more severe than what you anticipate. Do you understand that?

A. Yes.

Q. Has anyone attempted to force you to plead guilty in this case?

A. No.

Q. You're pleading guilty of your own free will?

A. Yes.

Q. Now, you understand that the charges to which you're pleading guilty are felony offenses. If I accept that plea, you'll be adjudged guilty of the offenses and that may deprive you of valuable civil rights such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess any kind of a firearm. Do you understand all that?
A. Yes.
Q. Now, Mr. Chafee outlined the maximum statutory penalties in this case a moment ago. The maximum penalties include 30 years imprisonment with respect to Count II; ten years of imprisonment with respect to Count III as well as the additional penalties regarding fines and the terms of supervised release and special assessments.
Do you understand that those are the maximum penalties that may apply in your case?
A. Yes.
Q. Now, you've heard the term "supervised release" used here today. You understand what supervised release is?
A. Yes.
Q. Can you tell me in your own words what you think it is?

A. Supervised probation once released out of jail.
Q. And what happens?
A. They check up on you, make sure you're doing everything right.
Q. Okay. You understand that because the maximum sentence in this case involves a penalty of more than 25 years there's no probation sentence available under the law. Do you understand that?
A. Yes.
Q. I mentioned the special assessments for each count of $100. Do you understand you'd be required to pay the special assessment for each of the two counts? That's a special assessment of $200.
A. Yes.
Q. You've heard reference to the Sentencing Guidelines. Have you discussed what the Sentencing Guidelines are with your attorney?
A. Yes.
Q. You understand, generally, how the Sentencing Guidelines might apply to your case?
A. They tell me what I'm looking at. We can go over or under.
Q. Okay. You understand then that I will not be able to determine the appropriate Guideline sentence for your case until after a presentence report is

prepared by the Office of Probation and after the Government and you and your attorney have had the opportunity to object to the findings and recommendations contained in that report; and that once I determine what the appropriate Guideline range is for your case, it may be that the sentence imposed is different than what you think it may be or what you anticipate it may be at this time. Do you understand that?

A. Yes.

Q. Do you also understand that I have the authority in some circumstances to depart from the Guideline range? That's either depart upward or depart downward depending on the circumstances that may be present. Do you understand that?

A. Yes.

Q. You understand that parole has been abolished in the federal system, and there's no such thing as parole. Do you understand that?

A. Yes.

Q. You understand that in some circumstances that you or the Government may have the right to appeal a sentence that I impose. Do you understand that?

A. Even if I plead guilty?

Q. If it's believed by you and your attorney that the

sentence I ultimately impose is an illegal sentence, that is one that, for example, if I were to sentence you to 50 years in prison, that would be an example of an illegal sentence because the statute doesn't provide -- it provides a 30-year maximum sentence for Count II.

You understand that if I do something that is illegal or you believe is illegal, your attorney believes is illegal, that will give you a right to appeal that sentence. The same is true if I did that and the Government thought that I had issued an illegal sentence. Do you understand that?

A. Yes.

Q. All right. Now, you have certain constitutional rights, Mr. Olivera. I'm going to review those constitutional rights with you now. I want to make sure that you understand by pleading guilty you're waiving those rights. All right?

First, you have the right to plead not guilty to the charges against you and persist in that plea through a trial including a trial by jury. Do you understand that?

A. (Witness nods head in the affirmative.)

Q. All right. You have the right at trial to the

assistance of counsel such as Mr. Roy. Do you understand that?
A. Yes.
Q. And in a trial, you would be presumed to be innocent, and it would be the burden of the Government to prove your guilt beyond a reasonable doubt. Do you understand that?
A. Yes.
Q. You'd have the opportunity at trial to hear and see all witnesses who would testify against you and to have them cross-examined on your behalf by your attorney, Mr. Roy. Do you understand that?
A. Yes.
Q. Do you also understand that you would have the right to testify on your own behalf or you could choose not to testify if that's what you chose to do, and the fact that you did not testify could not be used against you to prove your guilt. Do you understand that?
A. Yes.
Q. Do you also understand you would have the right to use the subpoenas and the power of the Court to force, to compel people to come to court who you might believe would assist you in your defense. Do you understand that?

A. (Witness nods head in the affirmative.)
Q. All right. You also understand that by entering a plea of guilty, and if I accept that plea, there'll be no trial and all of the rights which you have that I've just reviewed with you will be waived by you. Do you understand that?
A. Yes.
Q. All right. I want you to tell me in your own words what it is that you did in this case.
A. Just participated in something illegal.
Q. Give me the specifics of what you did.
A. I gave drugs to go trade for guns.
Q. You gave those to who?
A. Robert Camera.

THE COURT: All right. Now, I want you to listen carefully. I'm going to ask Mr. Chafee for the Government, he's going to do two things. He's going to describe the legal elements of the charges against you in this case, and he's going to describe the facts that the Government would prove if this matter went to trial. I want you to listen carefully. Okay?

MR. CHAFEE: The elements of the crimes to which the Defendant is pleading guilty, Count II, that on or about July 11th, 2003, here in Rhode

Island, he did knowingly and intentionally distribute a mixture and substance containing a detectable amount of cocaine or in this case he aided and abetted in the distribution of cocaine.

In that charge, the elements are that the Defendant knowingly, that is, he knew what he was doing; intentionally, he intended to do what he was doing; aided and abetted, that is, he helped knowing what was going on, knowing that a crime was to be committed, was going to be committed. He helped commit that crime by his actions, knowing that he was doing that. And that in the course of that crime in this case, cocaine was distributed. That means it was passed from one person to another intentionally, and that it was indeed cocaine. That cocaine, a Schedule II controlled substance.

Count III, the gun case charge, is that on or about July 11th, 2003, here in the District of Rhode Island, the Defendant, having been convicted of a crime punishable by a term of imprisonment for a term exceeding one year, that is, he had a felony conviction, did knowingly possess in and affecting commerce four firearms. In this case, it's set forth in the indictment a Smith & Wesson

.38, a Browning .9 millimeter, another Browning .9 millimeter, and a Colt Python .357, and that he, in this case, constructively possessed those weapons.

Now, the elements are that he had been convicted of this felony; that he knowingly, that is, he knew what he was doing; possessed, that is, he had within the control of himself or a person working for himself, in this case, a person working for him. In and affecting commerce, that means the guns traveled across state lines at some point. Doesn't mean that he had to do it, but at some point that the guns in their existence they had come across a state line. That's in and affecting commerce.

And that before all this happened on July 11th, he had previously been convicted of this felony.

Now, the evidence is -- what would be proved at trial is that this Defendant knew a man named Allan Bartelson from Vermont, and that they had had a long-time business relationship. And in the course of that relationship, they had spoken many times on the phone. They had met many times. The business involved the trading by Bartelson of

guns to Olivera for drugs.

And eventually, Bartelson was arrested. As he came north on Route 91 in Vermont, there was a tip that he had been down in Providence getting the cocaine, and he was arrested. And he was indicted for felony cocaine possession in Vermont.

Bartelson agreed then to cooperate with the authorities, and Bartelson described all his dealings with illegal gun dealings. And he was asked as part of his cooperation if he would make a phone call to Olivera in Providence.

So on July 1st, he made that phone -- one phone call. And that was taped by the agents of the Alcohol, Tobacco and Firearms Bureau.

And in that phone call, Bartelson talks to Olivera and says he's -- "I'll have those things next week. The guy's coming. Those toys from down in New York, I'm waiting for them." And he further goes on, "There are going to be 9's and 38's just like before." And Olivera says, "Okay. All right."

And Bartelson goes on, "They might be a bit warm. I don't know." And Olivera goes, "A little bit warm?" And Bartelson goes, "You're probably going to give me a little bit less if

they're warm, right? Yeah. Okay. That's good. All right. Talk to you then. All right, dude."

So what Bartelson is telling Olivera is these guns are warm. They're hot. They're stolen guns, and that he's probably going to -- Olivera is probably going to give him a little less cocaine as a result of getting the stolen guns.

So that was on July 1st. On July 10th, Bartelson again agreed to make another phone call to Olivera. And he calls him, and then Olivera calls him back. And this is recorded by the ATF agents.

And Bartelson says, "Hey, I'm coming down tomorrow. I got those two 38's and two 9's." 38's is a .38 caliber pistol. A nine is a .9 millimeter pistol. "How much are you going to give me for those?" Then Olivera says, well, he says, "Yeah. I don't even know because down here there's really like no material around." Material is a word for cocaine.

And Bartelson says, "No material?" And it goes on.

Finally -- it's not very long, but the conversation is -- Bartelson says, "I got two grand," meaning I got $2,000. "What do you want,

the 9's or the 38's?" And Olivera says, "Whichever ones are smaller." And Bartelson says, "Okay. The 38 specials." And Bartelson says, "Two? Two apiece?" And Olivera says, "One and a half." Means I'll give you one and a half ounces for each one. Then Bartelson says, "That will work. All right. I'm coming down about 2:30 in the afternoon." "All right. Call me tonight if you're definitely coming."

And Bartelson says, "Oh, I'm definitely coming. I ain't got a phone right now, Louie. I'm borrowing my brother's buddy's. I'm borrowing my buddy's." "Well, can I definitely count on you for two G's, right?" That's Olivera. "Yeah, you can count on that and two pieces." Pieces meaning $2,000 and the firearms.

So they agreed to meet. And they had been meeting many times so that this was a routine for them. So Bartelson was then taken down to the Providence Police Department by some agents from Vermont. The agents also brought four guns from Vermont, from -- there's a supply of guns that the Alcohol, Tobacco and Firearms agency uses for stings. They're working firearms. They are made to fire a bullet. And they come down, they're

sent wherever the deal is going to be done.

In this case, they came down from Vermont in a different car from Bartelson with the agents. And they were a Smith & Wesson .38 caliber; a Browning .9 millimeter semi-automatic; a Browning .9 millimeter semi-automatic, another one; a Colt Python .357 caliber.

Now, the plan was for an ATF, female ATF agent to go with Bartelson in an unmarked car, go to a Stop & Shop that was near -- about a mile from Olivera's house and pretend that the car was broken down in that parking lot. The effort was to be, to have Olivera come down to the parking lot. And why were they doing this? They felt it would be safer than sending agents into Olivera's apartment or his house at 81 Hawkins Street in Providence, about a mile away from the Stop & Shop.

So indeed, in the afternoon, the ATF agents set up this situation. They have the car with the female ATF agent, Agent Lacourse, and Allan Bartelson in it. In the parking lot, there are various unmarked cars with agents watching agents. And the effort was going to be made to see if they could have Olivera bring the drugs,

the cocaine, and give the cocaine to Bartelson or the agent, and then the agent would give the four handguns, working handguns that had crossed state lines.

And it didn't quite work out that way. They get to the parking lot and Bartelson calls Olivera and says, "I'm broken down in the parking lot. Come out and meet me." And that was about 2:45 p.m.

In the meantime, there have been agents that are set up watching 81 Hawkins Street, Olivera's house. And they're watching to see what happens.

So Bartelson tells Olivera he didn't have any money, but he had two more guns instead of the money so he's got a total of four guns. Olivera said he'd be able to exchange two ounces of cocaine for two guns and asked for Bartelson to call him back in five minutes.

About five minutes later Bartelson made another call to Olivera. And in this conversation, Olivera says he could do two for two, two ounces for two guns. Then Bartelson calls again to Olivera and tells him what kind of car they are and that they're in the Stop & Shop

parking lot.

At that time, Olivera said that he could swap four ounces of cocaine for the four guns and that he would be there in about ten minutes. Bartelson told Olivera that the guns were really nice.

About that time, as that's happening, the watchers at 81 Hawkins Street see a maroon Cherokee pull up, and two men get out, and they go in with Olivera, and they come out and then they drive off. And then this young man, Robert Camera, leaves the house on a bicycle and begins to ride down Hawkins Street toward Branch Avenue toward the Stop & Shop.

And one of the agents says, "Look, this fellow on the bicycle may be involved. Keep an eye on him."

And then the -- he broadcasts this to the team that's watching. Bartelson makes another phone call to Olivera and is told that Olivera had sent his kid to the parking lot and that he wanted Bartelson to give the kid, the boy, the guns to that person. Wanted Bartelson to give the guns to the person that had been sent. And the cooperating witness, Bartelson, says to Olivera he

didn't want to deal with this kid.

Then the kid on the bicycle, they flag him down. Sandy Lacourse in the parking lot flags down and Bartelson flags down the kid on the bicycle. And the kid says, which is Camera says, "Who sent you?" Or something like that. "Louie sent me."

And so then he comes up and he says he wants to do the deal, Camera does. And he says that Louie had sent him and it's all right.

And Agent Lacourse doesn't immediately agree to do it. In fact, there's a discussion back and forth because she's saying she doesn't want to deal with him. She's pretending that she's carrying these guns down for her boyfriend, the two out of the four have been sent from her boyfriend down to Providence and she's carrying them. She's the runner. She doesn't want to deal with somebody that she wasn't told to deal with.

So then there's a lot of discussion between Camera and Bartelson and the female Agent Lacourse. And Camera says that he's 25 years old and that he's Louie's son. He said that Louie had sent him and that he lived with Louie. And she told him, "I'd rather deal with Louie."

At that time, Bartelson made a phone call to Olivera and told him that the agent was -- he didn't refer to her as the agent, but this woman that he was with was reluctant to give the guns to his kid.

At that point, Bartelson hands the phone to Camera, who has a brief conversation with Olivera, after which he handed the phone back and then Lacourse tells Camera that the guns her boyfriend brought were 9's and that she wanted to talk to Louie to tell him that her boyfriend could get him .40 and .45 caliber guns.

And Camera says -- and then Camera says, "Well, that's what he wants right now. If that's what he wanted, then that's what he wants."

And Camera says -- he was getting anxious, and he said he wanted to do the deal. "I got this big thing in my pocket. Let's just make this play."

And eventually, to cut to the chase here, they agreed to -- Camera tells the agent, "Look, Louie is not coming. Let's do this thing." She agrees to do it. She puts the guns in Camera's backpack, and he, Camera, sticks the cocaine in Bartleson's pocket.

So Camera transfers the cocaine to Bartelson. Bartelson gives it to the agent. Camera rides off headed back to Luis with the four guns, doesn't get very far in the parking lot, and he's arrested with the four guns I've described in his backpack.

And then the evidence would be that the Defendant made admissions. And one of the admissions was that he had indeed arranged this guns-for-drugs deal. So he acknowledged that.

The evidence further would be that the Defendant had been, before July 11th, 2003, that he had been convicted of a felony, that is, a crime punishable by a term of imprisonment exceeding one year. We have a stipulation to that effect.

The drugs were tested at the lab, and they were found to be cocaine and weighing about 77 grams.

Now, after Camera was arrested in the parking lot, the agents moved and arrested Luis at his house at 87 Hawkins Street, and then he was brought down to law enforcement officers and made that admission that he had set up the deal.

It also would be proven that Camera had a

felony conviction prior to 7/11/03, and that would be proven, if we had to, by bringing in his probation officer and putting on -- and putting in a Certificate of Conviction that he had previously been convicted of a narcotics offense.

THE COURT: Okay. You said the amount of the cocaine was 77 grams?

MR. CHAFEE: I think it was 77 grams. 77 grams.

**BY THE COURT**: (Continuing)

Q. All right. Now, Mr. Olivera, did you listen carefully to what Mr. Chafee recited as the facts the Government would be prepared to prove if this matter went to trial?
A. Yeah, I guess.
Q. You did listen to him?
A. Yes. I listened to him.
Q. Okay. Do you agree that those are, in fact, the facts of this case?
A. No.
Q. No?
A. I was involved in it, but those ain't the facts. So I'm just -- you know what I mean? Yeah. I'll agree to the facts.
Q. First of all, I couldn't understand what you just

said. Say that again.
A. Those aren't all facts.
Q. Those are what facts?
A. They're not all the facts.
Q. They're not all the facts?
A. (Witness shakes head in the negative.)
Q. Okay. Are the facts that he recited --
A. You know what I'm saying that --
MR. ROY: Don't interrupt.
Q. Let me ask you the question. Okay? Are the facts Mr. Chafee just recited, those are the facts the Government says it could prove if this matter went to trial. There may be other facts, but as to those facts that he recited, do you agree that those facts are, in fact, true?
A. What he said is true, the way he explained it?
Q. Yes. Do you agree that what he said is true, that that's what happened in this case?
A. Yes.
Q. You do. Okay. Are there other facts you wish to tell me about? You need to talk to your attorney about that first. All right. Is there anything that I need to hear about this? Why don't you talk to your attorney for a moment about that.
MR. ROY: Thank you, Judge.

A. No. Nothing. I said I've been told everything.
Q. I didn't understand you. What?
A. I'm saying that there is no other facts.
Q. All right. Mr. Olivera, I've reviewed with you all of your rights. We've reviewed the Guidelines and so forth and the penalties, possible penalties that are involved in this case.
Having reviewed all of that with you, I'm going to ask you now how you wish to plead to the charges, guilty or not guilty.
A. Guilty.
THE COURT: Guilty. All right. It's the finding of the Court in the case of the United States versus Olivera that the Defendant is fully competent and capable of entering an informed plea; that the Defendant is aware of the nature of the charges and consequences of his plea; and that the plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offenses.
The plea is, therefore, accepted, and the Defendant is now adjudged guilty of that offense.
Now, Mr. Olivera, I told you previously that there will be a presentence report prepared

in this case by the Office of Probation. I encourage you to cooperate fully with the Office of Probation so they may obtain all of the information necessary in order that I may determine the appropriate sentence in this case. All right?

I'm going to set sentencing down in this matter for Friday, December 19th, 2003, at 10:30 a.m. The Defendant will be remanded and detained pending sentence.

Is there anything further with respect to the --

MR. CHAFEE: Nothing from the Government, your Honor.

THE COURT: Anything further, Mr. Roy?

MR. ROY: Nothing. Thank you, your Honor.

THE COURT: Very well. You can remove the Defendant. I want to discharge the jury myself once the Defendant's removed.

# CERTIFICATION

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Anne M. Clayton

Anne M. Clayton, RPR

January 6, 2004

Date